**<u>EXHIBIT A</u>**

**Merkury APA**

# ASSET PURCHASE AGREEMENT

dated as of December __, 2024

by and among

**Merkury Innovations, LLC,**

as Buyer,

and

**SmartHome Ventures, LLC,**

as Seller

3773189v1

**TABLE OF CONTENTS**

Article I DEFINITIONS ............................................................................................................. 4

| 1.1 | Definitions............................................................................................................ 4 |
| 1.2 | Construction........................................................................................................ 11 |

Article II PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES ........................... 11

| 2.1 | Purchase of Assets and Assumption of Liabilities.............................................. 11 |
| 2.2 | Purchased and Excluded Assets........................................................................... 12 |
| 2.3 | Assumed and Excluded Liabilities....................................................................... 14 |
| 2.4 | Transferred Contracts........................................................................................... 16 |
| 2.5 | Non-assignable Assets. ....................................................................................... 16 |

Article III PURCHASE PRICE AND CLOSING ......................................................................... 17

| 3.1 | Closing. ................................................................................................................ 17 |
| 3.2 | Purchase Price...................................................................................................... 17 |
| 3.3 | Debtor in Possession Financing/Credit Bid. ....................................................... 18 |
| 3.4 | Prorations. ............................................................................................................ 18 |
| 3.5 | Allocation of Purchase Price................................................................................ 19 |

Article IV REPRESENTATIONS AND WARRANTIES OF THE SELLER.............................. 19

| 4.1 | Organization......................................................................................................... 19 |
| 4.2 | Authorization of Transaction............................................................................... 19 |
| 4.3 | Ownership. ........................................................................................................... 20 |
| 4.4 | Intellectual Property............................................................................................. 20 |
| 4.5 | LIMITATION ON WARRANTIES...................................................................... 20 |

Article V REPRESENTATIONS AND WARRANTIES OF THE BUYER ............................... 21

| 5.1 | Organization......................................................................................................... 21 |
| 5.2 | Authorization of Transaction............................................................................... 21 |
| 5.3 | Noncontravention; Consents................................................................................ 21 |
| 5.4 | Litigation.............................................................................................................. 22 |
| 5.5 | Brokers or Finders................................................................................................ 22 |
| 5.6 | Financing.............................................................................................................. 22 |
| 5.7 | Buyer's Investigation........................................................................................... 22 |
| 5.8 | Tax. ...................................................................................................................... 23 |

Article VI COVENANTS ............................................................................................................. 23

| 6.1 | General.................................................................................................................. 23 |
| 6.2 | Excluding or Adding Purchased Assets Prior to Closing. ................................... 23 |
| 6.3 | Notices and Consents........................................................................................... 23 |
| 6.4 | Effectiveness of Representations and Warranties................................................ 24 |
| 6.5 | Conduct of the Business....................................................................................... 24 |
| 6.6 | Tax Sharing Agreements...................................................................................... 25 |
| 6.7 | Access to the Business, Records and Documents................................................ 25 |
| 6.8 | Publicity................................................................................................................ 26 |

| 6.9 | Contacts with Suppliers, Customers and Other Parties. | 26 |
|------|------|------|
| 6.10 | Ancillary Documents. | 26 |
| 6.11 | Confidentiality. | 26 |
| 6.12 | Delivery of Seller Disclosure Schedules. | 27 |
| 6.13 | Further Assurances. | 27 |
| 6.14 | Use of Name. | 27 |

Article VII EMPLOYEE MATTERS ........................................................................................... 27

| 7.1 | Employment. | 27 |
|------|------|------|
| 7.2 | Employee Benefit Matters. | 27 |
| 7.3 | Defined Contribution Plans. | 28 |
| 7.4 | Medical Records; Other Personnel Records; Payroll Deductions. | 28 |
| 7.5 | Wage Reporting. | 28 |

Article VIII CLOSING CONDITIONS .......................................................................................... 28

| 8.1 | Conditions to Obligations of the Buyer. | 28 |
|------|------|------|
| 8.2 | Conditions to Obligations of the Seller. | 30 |
| 8.3 | Frustration of Closing Conditions. | 31 |

Article IX TERMINATION ........................................................................................................... 31

| 9.1 | Termination of Agreement. | 31 |
|------|------|------|
| 9.2 | Effect of Termination. | 32 |

Article X MISCELLANEOUS ....................................................................................................... 32

| 10.1 | Survival of Representations and Warranties. | 32 |
|------|------|------|
| 10.2 | Notices. | 32 |
| 10.3 | Expenses; No Offset. | 33 |
| 10.4 | Bulk Sales or Transfer Laws. | 33 |
| 10.5 | Assignment; Successors and Assigns. | 33 |
| 10.6 | Amendment; Waiver. | 34 |
| 10.7 | Severability; Specific Performance. | 34 |
| 10.8 | Counterparts. | 34 |
| 10.9 | Descriptive Headings. | 34 |
| 10.10 | No Third-Party Beneficiaries. | 34 |
| 10.11 | Entire Agreement. | 34 |
| 10.12 | Exhibits and Schedules. | 35 |
| 10.13 | Non-Recourse. | 35 |
| 10.14 | Governing Law. | 35 |
| 10.15 | Submission to Jurisdiction; Consent to Service of Process. | 35 |
| 10.16 | WAIVER OF JURY TRIAL. | 36 |
| 10.17 | United States Dollars. | 36 |

2

**SCHEDULES:**

Schedule 2.2(a)(i)     Assumed Contracts
Schedule 2.2(a)(ii)    Intellectual Property Rights
Schedule 2.4.          Transferred Contracts
Schedule 7.1           Employees

3773189v1

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of December ___, 2024 (this "*Agreement*"), is entered into by and between SmartHome Ventures, LLC d/b/a Pepper, a Delaware limited liability company (the "*Seller*"), and Merkury Innovations, LLC, a Delaware limited liability company or its designee (the "*Buyer*" or "*Purchaser*").

## RECITALS:

**WHEREAS**, the Seller is a home automation service provider focused on making the smart home simple and accessible for the mass market. With state-of-the-art technology, a growing portfolio of interoperable devices, and strong focus on the customer experience and nationwide service coverage, Seller is creating solutions to surpass other home automation products currently in the market (the "*Business*"); and

**WHEREAS**, on August 9, 2024 (the "*Petition Date*"), the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") entered an Order for Relief commencing the Seller's bankruptcy case (Case No. 24-11640 (TMH)) (the "*Bankruptcy Case*") in the Bankruptcy Court; and

**WHEREAS**, the Seller desires to sell, transfer and assign to the Buyer, and the Buyer desires to purchase, acquire and assume from the Seller, pursuant to sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities, in each instance, free and clear of any and all Liens, on the terms and subject to the conditions set forth in this Agreement all as more specifically provided herein.

## AGREEMENT:

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1     Definitions.** For purposes of this Agreement, the following terms have the meanings set forth below:

"*Accounts Receivable*" has the meaning set forth in Section 2.2(a)(i).

"*Affiliates*" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, including without limitation, Get Notion, LLC (formerly known as Comcast Neptune, LLC) ("*Notion*").

"*Agreement*" has the meaning set forth in the Preamble.

"*Allocation*" has the meaning set forth in Section 3.5.

"*Alternative Transaction*" means the sale, transfer or other disposition of all or a material portion of the Purchased Assets to a third party other than the Buyer or its designee in a single transaction or series of related transactions, whether pursuant to a stock or asset sale, share exchange, merger, plan of reorganization, plan of liquidation, recapitalization, business combination or other similar transaction involving Seller, other than sales of inventory in the ordinary course of business.

"*Ancillary Documents*" means the Bill of Sale, Assignment and Assumption Agreement, Patent Assignment and Assumption Agreement, Trademark Assignment and Assumption, Domain Name Assignment Agreement, and each certificate and other document to be delivered pursuant to Article VIII.

"*Apportioned Obligations*" has the meaning set forth in Section 3.4.

"*Approval Order*" means an order from the Bankruptcy Court approving the sale of the Purchased Assets to the Buyer and the assumption of the Assumed Contracts and Assumed Liabilities by the Buyer and the conveyance of Permits under this Agreement pursuant to Sections 105, 363(b), 363(f) and 365 of the Bankruptcy Code, and which, among other things, (i) approves the transaction contemplated by this Agreement on the terms set forth herein; (ii) finds that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to the Buyer and shall vest the Buyer with title to the Purchased Assets free and clear of all Liens, Claims and encumbrances; (iii) finds that the consideration provided by the Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Purchased Assets; (iv) finds that, as of the Closing Date, the Assumed Contracts will have been duly assumed by the Seller and assigned to the Buyer in accordance with Sections 365 and 105 of the Bankruptcy Code; (v) finds that the Buyer is a "good faith buyer" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arm's-length Buyer; (vi) finds that this Agreement was negotiated at arm's-length; (vii) finds that the Buyer does not have any interest in the Seller or in any party affiliated with the Seller; (viii) finds that the sale of the Purchased Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code; (ix) orders that the Assumed Contracts assigned to the Buyer pursuant to this Agreement will be transferred to, and remain in full force and effect for the benefit of, the Buyer (or its designated transferee(s)), notwithstanding any provision in any such Assumed Contract or in applicable Law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or limits in any way such assignment or transfer; (x) approves the Ancillary Documents; (xi) finds that the Seller gave due and proper notice of the transaction contemplated by this Agreement to each party entitled thereto; (xii) finds that the Buyer is not a successor of the Seller; and (xiii) orders that, notwithstanding Sections 6004(h) and 6006(d) of the Bankruptcy Code, the Approval Order is not stayed and is effective immediately upon entering.

"*Assumed Contracts*" has the meaning set forth in Section 2.2(a)(ii).

"*Assumed Liabilities*" has the meaning set forth in Section 2.3.

"*Avoidance Actions*" means all avoidance claims under the Bankruptcy Code, including all rights, claims, causes of actions and remedies arising under Bankruptcy Code Sections 329, 502(d), 542, 544, 545, 547, 548, 549, 550, 551 and 553.

"*Bankruptcy Case*" has the meaning set forth in the Recitals.

"*Bankruptcy Code*" means 11 U.S.C. §§101 *et seq*.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Bill of Sale, Assignment and Assumption Agreement*" has the meaning set forth in Section 8.1(f)(ii).

"*Books and Records*" means all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium) of the Seller, including Tax books and records and Tax Returns of the Seller used or held for use in connection with the ownership, operation or conduct of the Purchased Assets, including Assumed Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers and other data; *provided*, that the Seller may retain copies of the foregoing for administrative purposes.

"*Business*" has the meaning set forth in the Recitals.

"*Buyer*" has the meaning set forth in the Preamble.

"*Claim*" means any claim (including any cross-claim or counterclaim), demand, investigation, chose in or cause of action, suit, default, assessment, litigation, third party action, arbitral proceeding or proceeding by or before any Governmental Entity or any other Person, including those defined by Section 101 (5) of the Bankruptcy Code.

"*Closing*" has the meaning set forth in Section 3.1.

"*Closing Date*" has the meaning set forth in Section 3.1.

"*Code*" means the Internal Revenue Code of 1986, as amended (together with all rules and regulations promulgated thereunder).

"*Confidential Information*" means any confidential information with respect to the Business, including, without limitation, methods of operation, customers, customer lists, products, prices, fees, costs, technology, inventions, trade secrets, know-how, software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

"*Cure Amounts*" means the cure, compensation and restatement costs and expenses of or relating to the assumption and assignment of the contracts, leases and other agreements included

in the Assumed Contracts assumed and assigned to the Buyer hereunder pursuant to Section 365 of the Bankruptcy Code.

"*Defined Contribution Plan*" means a defined contribution plan intended to be qualified under Section 401(a) of the Code.

"*Effective Time*" has the meaning set forth in Section 3.1.

"*Employees*" has the meaning set forth in Section 7.1.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Excluded Assets*" has the meaning set forth in Section 2.2(b).

"*Final Cash Collateral Order*" means the *Final Order (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; and (II) Modifying Automatic Stay* [D.I. 143].

"*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; *provided, however*, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue; and *provided further* that, in the case of the Approval Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Buyer, in its sole and absolute discretion, elects to proceed with the Closing.

"*Governmental Entity*" means the United States, any state or other political subdivision thereof and any other foreign or domestic entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission, court, tribunal or instrumentality of the United States or any foreign entity, any state of the United States or any political subdivision of any of the foregoing.

"*Income Tax Return*" means, with respect to any Income Tax, any information return for such Income Tax, and any return, report, statement, declaration, claim for refund or document filed or required to be filed under the Law for such Income Tax, and any schedule or attachment thereto or amendment thereof.

"*Income Taxes*" means any federal, state, provincial, local, foreign and other income, alternative minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth or gross receipts taxes or similar governmental charge, including any estimated tax, interest, penalties or additions to tax or additional amounts in respect to the foregoing, including

3773189v1

any transferee, successor or secondary liability for any such tax and any liability assumed by agreement or arising as a result of being or ceasing to be a member of any affiliated group, or similar group under state, local or foreign Law, or being included or required to be included in any Income Tax Return relating thereto.

"*Indebtedness*" means, as to any Person, (a) all obligations of such Person for borrowed money (including obligations for reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured) or evidenced by a note, bond, debenture, draft or similar instrument, (b) all obligations of such Person to pay the deferred purchase price of property or services (but excluding accounts payable arising in the ordinary course of business), (c) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (d) all indebtedness created or arising under any capital lease, conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property) and (e) any guaranty of, or any contingent obligation in respect of, any indebtedness or other obligation of any other Person (other than an obligation of another Seller arising out of the conduct of the Business), but only to the extent of the obligation guaranteed.

"*Intellectual Property Rights*" means any and all of the following, in any jurisdiction throughout the world: (i) patents, industrial designs, and utility models and applications for any of the foregoing, including all provisionals, divisionals, continuations, continuations-in-part, requests for continuing examination, reissues, reexaminations, renewals and extensions of any of the foregoing, all foreign counterparts and all rights to claim priority of any of the foregoing; (ii) trademarks, service marks, certification marks, trade names, trade dress, logos, slogans, tag lines, fictitious business names, uniform resource locators, internet domain names, social media accounts and handles, and all other source or business identifiers or designators of origin (whether registered or unregistered); all registrations and applications for registration of, and renewals and extensions of, any of the foregoing; and all common law rights in and goodwill associated with any of the foregoing; (iii) works of authorship, copyrights, mask work rights, database rights, and design rights (all whether registered or unregistered); and all registrations and applications for registration of, and all renewals and extensions of, any of the foregoing; and all moral rights associated with any of the foregoing, and all economic rights of authors and inventors, however denominated (iv) software, software implementations of algorithms, firmware, databases, data collections, and artificial intelligence technologies (including machine learning technologies and deep learning technologies), including source code, object code, algorithms, models, model weights, neural networks, code repositories, development tools, application programming interfaces, user interfaces, technical architecture, user experience (UX) design, UX patterns, user interface design, files, manuals, programmers' notes, derivative works, methods, frameworks, foreign language versions, bug fixes, upgrades, updates enhancements, and current and prior versions and releases; and all hardware systems design, specification, and documentation materials related to the foregoing; and all media and other tangible property necessary for the delivery or transfer of any of the foregoing, and all rights therein; (v) trade secrets and other proprietary and confidential information and data, including inventions (whether or not patentable or reduced to practice), invention disclosures, ideas, developments, improvements, know-how, designs, drawings, algorithms, models, source code, methods, processes, techniques, formulae, research and

8

development, compilations, compositions, prototypes, manufacturing processes, production processes, devices, specifications, reports, analyses, data analytics, customer lists, supplier lists, pricing information, cost information, business plans, business proposals, marketing plans, and marketing proposals; (vi) any rights recognized under applicable law that are equivalent or similar to any of the foregoing; and (vii) all rights to sue and collect damages for past, present and future infringement and other violations of any of the foregoing.

"*Law*" means any applicable federal, state, local or foreign law, statute, common law, rule, regulation, ordinance, permit, order, writ, injunction, judgment or decree of any Governmental Entity.

"*Liability*" means any direct or indirect, primary or secondary, liability, Indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), Claim, deficiency, guaranty or endorsement (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the ordinary course of business) of any type, whether accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate matured or unmatured, or otherwise including any Liens securing the foregoing.

"*Lien*" means any pledge, security interest, charge, Claim or other lien.

"*Material Adverse Effect*" means a material adverse effect on the business, results of operations or condition (financial or otherwise) of the Business and the Purchased Assets taken as a whole; *provided, however*, that "*Material Adverse Effect*" will not include, and the determination of the existence of a Material Adverse Effect shall not take into account, any of the following: (i) any failure by the Seller to meet any projections, forecasts or predictions of revenue, earnings or other measures of financial performance; (ii) any change, event, circumstance or effect attributable to general economic conditions in the United States or any foreign jurisdiction in which Seller has operations or sales; (iii) any change, event, circumstance or effect attributable to conditions affecting the industries in which the Business operates; (iv) any change, event, circumstance or effect attributable to financial, banking or securities markets generally (including changes in interest rates or any market indices); (v) any change or proposed change in any Laws affecting the Business or the Purchased Assets or the interpretation thereof; (vi) any change in accounting rules; (vii) any change or proposed change, event, circumstance or effect attributable to the announcement of the transactions contemplated hereby, including any potential or actual disruption of customer demand or purchase orders, or relationships with Employees, customers, business partners, suppliers or other constituencies; (viii) any change, event, circumstance or effect attributable to compliance with the terms of, or the taking of any action required by, this Agreement or otherwise taken or not taken at the request of Buyer; or (ix) any change, event, circumstance or effect attributable to national or international political or social conditions, including the outbreak of war or international hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such war, hostilities, acts of war, sabotage or terrorism or military actions, whether in the United States or elsewhere.

"*Nonassignable Asset*" has the meaning set forth in Section 2.5(a).

"*Parties*" means the Seller and the Buyer together, and "*Party*" means the Seller, on the one hand, or the Buyer, on the other hand, as the case may be.

3773189v1

"*Permits*" has the meaning set forth in Section 2.2(a)(v).

"*Person*" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Entity, whether foreign or domestic.

"*Post-Closing Period*" has the meaning set forth in Section 3.4.

"*Pre-Closing Period*" has the meaning set forth in Section 3.4.

"*Purchase Price*" has the meaning set forth in Section 3.2(a).

"*Purchased Assets*" has the meaning set forth in Section 2.2(a).

"*Schedule*" means a disclosure schedule to this Agreement, including each of the Seller Disclosure Schedules, that is incorporated herein pursuant to Section 10.12.

"*Seller Disclosure Schedules*" means, collectively, all of the Schedules in respect of Article IV of this Agreement that are delivered by the Seller to the Buyer in accordance with Section 6.12 hereof.

"*Seller*" has the meaning set forth in the Preamble.

"*Seller's Employee Benefit Plan*" means each employee pension benefit plan within the meaning of Section 3(2) of ERISA, employee welfare benefit plan within the meaning of Section 3(1) of ERISA, fringe benefit plan and other incentive compensation or bonus programs, policies and arrangements, whether or not subject to ERISA, that the Seller or any of their Affiliates maintain with respect to the current or former employees of the Business or to which the Seller or any of its Affiliates contributes or has any obligation to contribute with respect to the current or former employees of the Business.

"*Seller's Knowledge*" means the actual knowledge of Albert Altro, Scott Ford and David Bottoms.

"*Seller Required Consents*" means all consents and approvals of all Governmental Entity, and all other Persons, required and provide notifications to all Persons required to, in each case, expeditiously close the transactions contemplated by this Agreement.

"*Tangible Personal Property*" has the meaning set forth in Section 2.2(a)(iv)12.

"*Tax*" or "*Taxes*" means a tax or taxes of any kind or nature, or however denominated, including liability for federal, state, provincial, local, foreign or other sales, use, transfer, registration, business and occupation, value added, excise, severance, stamp, premium, windfall profit, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax or similar governmental charge, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect to the foregoing, including any transferee, successor or secondary liability for a tax and any liability assumed by agreement or arising as a result of being or ceasing

10

to be a member of any affiliated group, or similar group under state, local or foreign Law, or being included or required to be included in any Tax Return relating thereto; *provided, however*, that "Tax" or "Taxes" will not include any Income Taxes.

"***Tax Returns***" means, with respect to any Tax, any information return for such Tax, and any return, report, statement, declaration, claim for refund or document filed or required to be filed under the Law for such Tax, any schedule or attachment thereto or amendment thereof.

"***Transferred Contracts***" means the contracts that are not assumed and assigned to Buyer at Closing but may be assumed and assigned to Purchaser within thirty days after closing, as more specifically identified on Schedule 4.

"***Transferred Employees***" has the meaning set forth in Section 7.1.

"***Treasury Regulation***" means the final or temporary regulations promulgated under the Code, in effect from time to time.

## 1.2    Construction.

(a)    For purposes of this Agreement, whenever the context requires, the singular will include the plural, and vice versa, the masculine gender will include the feminine and neuter genders, the feminine gender will include the masculine and neuter genders, and the neuter gender will include masculine and feminine genders.

(b)    As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation."

(c)    Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections and Exhibits to this Agreement.

(d)    As used in this Agreement, the terms "hereof," "hereunder," "herein" and words of similar import will refer to this Agreement as a whole and not to any particular provision of this Agreement.

(e)    Each Party hereto has participated in the drafting of this Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties. Consequently, this Agreement will be interpreted without reference to any rule or precept of Law to the effect that any ambiguity in a document be construed against the drafter.

## ARTICLE II
## PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES

### 2.1    Purchase of Assets and Assumption of Liabilities.

Subject to approval of the Bankruptcy Court, and upon the terms and conditions set forth in this Agreement, at the Closing, the Buyer will purchase from the Seller, and the Seller will sell, assign, convey and deliver to the Buyer, free and clear of any Liens, the Purchased Assets, and the

11

3773189v1

Buyer will assume and agree to pay, discharge and perform when due all of the Assumed Liabilities.

## 2.2   Purchased and Excluded Assets.

(a)   **Purchased Assets**. The "*Purchased Assets*" are all of the right, title and interest that the Seller possesses in and to all of the following assets (other than the Excluded Assets), as the same may exist as of the Effective Time:

(i)   Accounts Receivable. All accounts and notes receivable and other such Claims for money due to the Seller, arising from pre-Closing transactions, including such items arising from the rendering of services or the sale of goods or materials together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefore, including recoverable deposits, and including such Claims for money due to the Seller where legal action has been taken against trade debtors in order to recover such Claims (the "*Accounts Receivable*");

(ii)   Assumed Contracts. All rights, if any, of Seller, to the extent assignable, in and under all contracts, arrangements, licenses, personal property leases, open bids, commitments, purchase orders, sales orders and other agreements with customers or clients of the Business set forth on Schedule 2.2(a)(ii) (collectively, the "*Assumed Contracts*");

(iii)   Intellectual Property Rights. All Intellectual Property Rights of the Seller used or held for use in connection with the Assumed Contracts, including, without limitation those set forth on Schedule 2.2(a)(iii);

(iv)   Tangible Personal Property. All tangible personal property owned solely by Seller, and not requiring further monetary obligation, to the extent related or used in any way in and to the Business, wherever located, including, but not limited to, all machinery, equipment, spare parts, tools, test equipment, furniture, fixtures, office equipment, computers and peripheral equipment and supplies and other tangible personal property (the "*Tangible Personal Property*");

(v)   Permits. All approvals, agreements, authorizations, permits, licenses, easements, orders, certificates, registrations, franchises, qualifications, leases, rulings, waivers, variances or other forms of permission, consent, exemption or authority issued, granted, given or otherwise made available by or under the authority of any Governmental Entity, which are used or held for use in connection with the ownership, conduct or operation of the Assumed Contracts by the Seller (the "*Permits*");

(vi)   Warranty Rights. All rights under all warranties, representations and guarantees made by suppliers, manufacturers and contractors with respect to the Purchased Assets;

(vii)   Avoidance Actions. The Avoidance Actions of the Debtor including but not limited to those arising under Section 547, 544, 548 of the Bankruptcy Code, including all proceeds thereof;

12

(viii)    Director and Officer Claims. Any Claims against (1) Seller and/or its Affiliate's directors and officers and (2) ID Fund;

(ix)    Goodwill. All goodwill arising in connection with ownership, operation or conduct of the Purchased Assets and the Business;

(x)    Transferred Employee Records. Copies of the Transferred Employee Records, but excluding from the foregoing any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by Law;

(xi)    Books and Records. Copies of the Books and Records of Seller related solely to the Purchased Assets or the Assumed Liabilities; and

(xii)    Other Assets. Any assets relating solely to the operation of the Purchased Assets and which are identified after the date hereof.

(b)    **Excluded Assets**. Notwithstanding anything to the contrary contained in Section 2.2(a), the Seller will retain all of its right, title and interest in and to, and will not sell, transfer, assign, convey or deliver to the Buyer, and the Purchased Assets will not include, the following (collectively, the "*Excluded Assets*"):

(i)    Cash. Any cash or cash equivalents, including any marketable securities or certificates of deposit, or any collected funds or items in the process of collection at the Seller's financial institutions (but such items in process shall only be excluded if already applied to reduce the amount of accounts receivables relating thereto) through and including the Closing;

(ii)    Intercompany Debt. All Indebtedness owed to Seller by any affiliate of Seller;

(iii)    Equity Interests. All equity interests in other Persons owned by the Seller;

(iv)    Tax Claims. (A) Any rights of the Seller or any of their respective Affiliates with respect to any Income Tax refunds, credits, rebates or abatements, or to any Tax refunds, credits or abatements with respect to assets that are not Purchased Assets; (B) subject to Section 3.4, any rights to credits, refunds, rebates or abatements of Taxes with respect to the Purchased Assets relating to periods (or portions thereof) ending on or prior to the Closing; (C) any Income Tax Returns and Income Tax records of the Seller or any of their respective Affiliates, and any Tax Returns or Tax records of the Seller or any of their Affiliates that relate to the Excluded Assets, and (D) any rights of the Seller or any of their respective Affiliates under any Tax or Income Tax allocation or sharing agreement;

(v)    Insurance Policies. All insurance policies of the Seller and all rights thereunder, including, without limitation, any and all insurance refunds or Claims made under such policies relating to the Purchased Assets on or before the Closing Date;

13

(vi)     Prepaid Expenses. All credits, prepaid expenses, deferred charges, advance payments, security deposits, utility deposits, deposits with landlords, prepaid items, deposits and Claims for refunds or reimbursements, security deposits made in connection with the Bankruptcy Cases, and the like;

(vii)     Corporate Documents. The corporate charters, limited liability company agreements, qualifications to conduct business as foreign Persons, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates, books and records relating to Income Taxes, and any other documents relating to the organization, maintenance and existence of the Seller as corporations or limited liability companies, as applicable;

(viii)     Employee Benefit Plans. Except as otherwise specifically provided in this Agreement, Seller's Employee Benefit Plan and corresponding assets or any rights of a Seller or any of its Affiliates in each Seller's Employee Benefit Plan provided by a Seller to the Employees;

(ix)     Seller's Rights. Any rights of the Seller under this Agreement, any Ancillary Document or any other agreement between Seller and the Buyer;

(x)     Excluded Assets and Excluded Liabilities Rights. Any rights, Claims or legal actions of the Seller relating to any of the Excluded Assets or Excluded Liabilities;

(xi)     Excluded Contracts. Any contract (including any post-petition contracts) to which the Seller is a party that is not an Assumed Contract or a Permit (each, an "*Excluded Contract*"); and

(xii)     Other Excluded Assets. Any other assets, rights and properties not expressly assumed by this Agreement.

### 2.3    Assumed and Excluded Liabilities.

(a)     **Assumed Liabilities**. The "*Assumed Liabilities*" include and are limited to the following:

(i)     Assumed Contracts. All Liabilities arising under the Assumed Contracts arising on or after the Closing Date, including all Closing Date Cure Amounts in connection therewith;

(ii)     Operating Liabilities. All Claims, Liabilities, responsibilities, obligations, costs and expenses arising in any way out of the operation of the Business or the ownership or operation of the Purchased Assets on or after the Closing Date, including, without limitation, (A) any and all Taxes arising out of or attributable to the operation or ownership of the Purchased Assets on or after the Closing Date, (B) any and all Claims associated with the use of the Purchased Assets, including Liability to any third party for any injury or damage to persons or property and any damage to the asset itself, due to any condition of, defect in, or design of the asset in question, latent or otherwise, to the extent that such condition, defect, or design occurs on

14

or after the Closing Date, and (C) any and all warranty obligations or Claims relating to warranties provided to customers of the Business on or after the Closing Date.

(iii) Compensation Liabilities. All Liabilities in respect of salaries, wages, sales commissions and other employment compensation (and related withholdings and payroll Taxes) to the extent accrued or incurred in the ordinary course of business after the Closing;

(iv) Trade Payables. All Liabilities in respect of trade payables arising solely from the Purchased Assets incurred in the ordinary course of business after the Closing Date;

(v) Post-Closing Liabilities; Accounts Payable. All Liabilities and accounts payable relating to the Purchased Assets that arise from events, facts or circumstances that occur after the Closing Date;

(vi) Post-Closing Tax Liabilities. All Liabilities (including Liabilities for Income Taxes of the Buyer (other than any transferee, successor or secondary Liability for Income Taxes of the Seller) and Taxes with respect to the Purchased Assets for periods (or portions thereof) ending after the Closing) incurred, accrued or arising after the Closing in connection with the conduct or operation of the Business or the use or ownership of the Purchased Assets after the Closing; and

(vii) The obligations set forth and described in Section 7 of this Agreement.

(b) Excluded Liabilities. The Buyer will not assume or become responsible for, and will not be deemed to have assumed or to have become responsible for any Liabilities and obligations other than the Assumed Liabilities, including the following Liabilities and obligations of the Seller (collectively the "*Excluded Liabilities*"):

(i) Excluded Contract Liabilities. Any Liabilities arising under any contracts, agreements, leases and commitments other than under the Assumed Contracts;

(ii) Excluded Employment Liabilities. Any Liabilities of the Seller not assumed by the Buyer pursuant to Section 2.3(a)(iii) or Article VII of this Agreement, related to Seller's Employee Benefit Plan, whether or not such Liability or obligation arises prior to, on or after the Closing Date. Buyer is not assuming any Defined Contribution Plan or Employee Benefit plan of Seller or any liability associated therewith;

(iii) Other Excluded Employment Liabilities. Except as otherwise provided in this Agreement, any other Liability of the Seller relating to the employment or termination of employment of any (A) Employee arising from or related to the operation of the Business of the Seller prior to the Closing of the transactions contemplated by this Agreement (including any severance policy, plan, agreement or program which exists or arises, or may be deemed to exist or arise, as a result of, or in connection with, the transactions contemplated by this Agreement), or (B) individual who is not a Transferred Employee arising on or after the Closing Date;

15

3773189v1

(iv)     Excluded Tax Liabilities.  Any Liabilities relating to (A) Income Taxes of the Seller (including Income Taxes payable by reason of the transactions contemplated by this Agreement); (B) Taxes of the Seller with respect to Excluded Assets; (C) all Taxes with respect to the Purchased Assets for periods (or portions thereof) ending on or before the Closing Date; and (D) any Tax or Income Tax allocation or sharing agreement to which any of the Seller is a party;

(v)     Affiliate Obligations. Any Liabilities incurred by Seller with respect to Seller obligations arising by virtue of Seller's intercompany relationships and/or Affiliates, including without limitation, Liabilities arising from Notion in connection with an Assumed Contract. For purposes of clarity, Buyer shall not assume any Liabilities arising pre-Petition Date and/or after the Closing Date from Notion in connection with (A) Aligned Technology Group and (B) Amazon Web Services, Inc.

(vi)     Other Excluded Liabilities.  Any Liabilities of the Seller not identified as Assumed Liabilities in Section 2.3.

**2.4     Transferred Contracts.**  At Closing Seller shall assign to Buyer the Assumed Contracts to pursuant to section 363 and 365 of the Bankruptcy Code identified on Schedule 2.4. Within thirty days following the Closing Buyer may identify any Transferred Contract then in effect that Seller has not otherwise disposed of, or agreed to dispose of, that Buyer wishes to acquire as a Transferred Contract by providing written notice of such designation to Seller and Seller will use reasonable best efforts to cause such contract to be assumed and then assigned to Buyer. Buyer will be responsible for paying any related cure obligation associated with such Transferred Contract (or such other amount as the Buyer and the contract party may have otherwise negotiated and agreed to).

**2.5     Non-assignable Assets.**

(a)     Notwithstanding anything to the contrary, nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset (including any Permit or Assumed Contract) to the Buyer which by its terms or by Law is not assignable or transferable without the consent of a third party or a Governmental Entity or is cancelable by a third party in the event of an assignment or transfer (a "***Nonassignable Asset***"), unless and until such consent shall have been obtained or unless such consent is not required by virtue of the Bankruptcy Code.

(b)     The Seller and the Buyer shall each use commercially reasonable efforts to obtain as expeditiously as possible any consent that may be required for the assignment or transfer of a Nonassignable Asset to the Buyer; *provided, however,* that neither the Seller nor the Buyer shall be required to make any payment to obtain any such consent with respect to any Nonassignable Asset.

16

3773189v1

## ARTICLE III
## PURCHASE PRICE AND CLOSING

### 3.1 Closing.

The closing of the transactions contemplated by this Agreement (the "***Closing***") will occur as promptly as practicable, but in no event more than 3 business days, following the satisfaction and/or waiver of all conditions to Closing set forth in Article VIII (other than any of such conditions that by its nature is to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions by the appropriate Party), at the offices of Sullivan Hazeltine Allinson LLC, 919 N. Market St. Street, Suite 420, Wilmington, DE 19801, or at such other place on such other date as the Parties may agree in writing. The Closing may take place remotely. The date on which the Closing actually occurs will be referred to as the "***Closing Date***," and the Closing will be deemed effective as of 10:00 a.m., Eastern Daylight time, on the Closing Date (the "***Effective Time***").

### 3.2 Purchase Price.

(a) The aggregate purchase price for the Purchased Assets shall be equal to: (i) a portion of the Assignment of Claim of even date herewith by and between Buyer and Chapford Credit Opportunities Fund LP ("***Chapford***") in the amount of Three Million Dollars ($3,000,000.00)(the "***Chapford Credit Bid***"), *plus* (ii) the assumption of the Assumed Liabilities, including payment of the Closing Date Cure Amount, *plus* (iii) the DIP Loan as funded at Closing, *plus* (iv) a cash component to be determined which is comprised of payment by Buyer of allowed post-petition administrative obligations of Seller's bankruptcy estate (the "***Administrative Obligations***")(collectively, the "***Purchase Price***"). For the avoidance of doubt, the Chapford Credit Bid does not include any portion of the Adequate Protection Superpriority Claim (as defined in the Final Cash Collateral Order).

(b) The Purchase Price shall be payable by the Buyer as follows:

(i) Closing. Buyer shall (1) deliver a surrender and release of the Chapford Credit Bid and (2) surrender and release the DIP Loan and (3) credit Seller with the satisfaction of the same amounts in order to satisfy a portion of the Purchase Price to be paid at Closing (collectively, the "***Credit Bid Amount***").

(ii) Administrative Obligations. Prior to the Closing, the Operating Trustee shall provide Buyer with (i) a total of the accrued and unpaid administrative obligations including professional fee obligations, Operating Trustee fees, and U.S. Trustee fees (the Administrative Obligations through November 30, 2024, and (ii) an estimate of the additional Administrative Obligations through the Closing for Buyer to approve. Buyer shall advance to the Operating Trustee the amount of the accrued and unpaid professional fees through November 30, 2024 and the budgeted administrative obligations through December 15, 2024 to the Operating Trustee by no later than December 18, 2024. Within sixty days of Closing, the Operating Trustee shall file a motion with the Bankruptcy Court seeking the allowance and payment of any unpaid Administrative Obligations other than professional fees, which accrued or were otherwise due on the later of December 31, 2024 or the Closing, which Buyer shall pay within 10 days of the entry

17

3773189v1

of a Final Order to the extent any additional payment is required, or the Operating Trustee shall refund to Purchaser, to the extent the payments exceeded the allowed Administrative Obligations. If any administrative expense, other than for payment of professional fees, is not (i) included in the budgeted amounts provided by the Operating Trustee to the Buyer as approved administrative obligations accrued through December 15, 2024 or (ii) approved pursuant to the motion filed by the Operating Trustee within sixty days of Closing, Buyer is not assuming and Buyer shall not be liable for payment of any such administrative expenses. For the avoidance of doubt, all professional fee obligations are subject to approval by the Court after notice and a hearing. Professionals shall file fee applications for compensation for services rendered and reimbursement of expenses incurred through January 31, 2025 (the "Fee Applications") by no later than sixty days from closing and the Operating Trustee will use his best efforts to schedule a hearing on the Fee Applications with the Court within ninety days of Closing.

(iii)   Cure Amounts. Buyer shall negotiate cure amounts with each applicable third party (collectively, the "***Closing Date Cure Amounts***"). To the extent the Closing Date Cure Amount is less than the Cure Amount filed with the Bankruptcy Court, the Seller shall receive a release from such third party with respect to the difference between the applicable Cure Amount and the corresponding Closing Date Cure Amount. The payment timeline and procedure for each Closing Date Cure Amount shall be mutually agreed upon by Buyer and such third party and Buyer shall credit Seller with the satisfaction of the same.

### 3.3   Debtor in Possession Financing/Credit Bid.

Buyer committed to provide debtor in possession financing to Seller in an amount of One Million Dollars ($1,000,000.00) and any additional amounts agreed to and negotiated by the Parties and as approved by Final Order of the Bankruptcy Court (together with the principal, plus interest, premium, legal fees and expenses, and any other amounts due to Buyer or Buyer's Affiliate as provided under any such financing (collectively, the "***DIP Loan***")) pursuant to that certain Superpriority Secured Debtor-In-Possession Credit and Security Agreement dated as of September 27, 2024.  Buyer shall reduce the Purchase Price by the amount of the DIP Loan outstanding as of the Closing Date and the Chapford Credit Bid by (i) delivering fully executed releases with respect to the full amount of the DIP Loan and the Chapford Credit Bid and (ii) paying the balance of the Purchase Price after reducing the Purchase Price by the amount of the DIP Loan and Chapford Credit Bid in accordance with this Article III.

### 3.4   Prorations.

Except with respect to Administrative Obligations payable pursuant to Section 3.2(b)(ii),all Taxes and all rents, utilities and other charges against, or payable with respect to, any of the Purchased Assets relating to a time period beginning prior to, and ending after, the Closing (the "***Apportioned Obligations***") shall be calculated as of Closing, and shall be prorated (based on the most recent available tax statement, latest tax valuation and latest bills) based on the number of days in the relevant period falling on and before the Closing (the "***Pre-Closing Period***"), and the number of days in the relevant period falling after the Closing (the "***Post-Closing Period***"). If the Closing occurs before the amount of an Apportioned Obligation is fixed for a relevant time period, the amount of such Apportioned Obligation shall be deemed to be calculated based on the amount of such Apportioned Obligation for the prior equivalent time period. The Seller will be responsible

for the Apportioned Obligations allocated to the Pre-Closing Period, and the Buyer will be responsible for the Apportioned Obligations allocated to the Post-Closing Period. The Seller will pay Apportioned Obligations that are due and payable on or prior to the Closing Date, and such amount will be paid at Closing by the Seller for any part of that amount apportioned to the Seller. The Buyer will pay Apportioned Obligations that are due and payable after the Closing Date, and such amount will be paid at Closing by the Buyer for any part of that amount apportioned to the Buyer. Any refund, rebate or similar payment received by or credited to either the Buyer or the Seller that is properly apportioned to the other Party pursuant to the principles of this Section 3.4 will be timely paid over to such other Party.

## 3.5    Allocation of Purchase Price.

The Seller and the Buyer will attempt in good faith to agree upon the allocation of the Purchase Price, and all other relevant assumed Liabilities and costs among the Purchased Assets (the "*Allocation*") prior to the Closing Date, solely for Income Tax purposes in accordance with the provisions of Section 1060 of the Code and any other applicable provisions of Law. If such an agreement is reached, the Seller and the Buyer will file all required Tax Returns and Income Tax Returns consistent with such Allocation, and not take any inconsistent position for any Income Tax or Tax purpose, unless otherwise required to do so by a change of Law or good faith resolution of a contest. If such an agreement is not reached, then the Seller and the Buyer will adopt the Seller's reasonably proposed allocation. Notwithstanding the foregoing, the Allocation for Income Tax purposes shall not be binding on any party in interest for purposes of determining distributions in connection with the liquidation of the Seller's bankruptcy estate.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the Schedule of the Seller Disclosure Schedules corresponding to the respective Section of this Article IV, the Seller hereby represents and warrants to the Buyer as of the date hereof and the Closing Date the following:

### 4.1    Organization.

The Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. The Seller is duly qualified or licensed to do business as a foreign entity and is in good standing in each jurisdiction in which the ownership or lease of the Purchased Assets or the conduct of the Business requires such qualification or license, except where the failure to be so qualified or be so licensed would not reasonably be expected to result in a Material Adverse Effect. The Seller has all requisite corporate or limited liability company power and authority to carry on the Business as currently conducted and to own, lease or use, as the case may be, the Purchased Assets in connection herewith.

### 4.2    Authorization of Transaction.

Subject to entry of the Approval Order, the Seller has all requisite limited liability company power and authority to execute, deliver and perform this Agreement and each of the Ancillary Documents to which it is a party and to perform its obligations hereunder and thereunder. Subject to entry of the Approval Order, this Agreement constitutes, and each of the Ancillary Documents

19

when executed and delivered by such Seller will constitute a valid and legally binding obligation of the Seller (assuming that this Agreement and such Ancillary Documents constitute valid and legally binding obligations of the other parties thereto), enforceable in accordance with its terms and conditions, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights, or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing.

### 4.3    **Ownership.**

The Seller has good and marketable title to the Purchased Assets, including, without limitation, Intellectual Property Rights licensed by Seller from a third-party.

### 4.4    **Intellectual Property.**

(a)      To Seller's Knowledge, Seller owns, licenses, sublicenses or otherwise possesses legally enforceable rights to use all Intellectual Property Rights held by Seller for use in the conduct of the Business as currently conducted (in each case excluding generally commercially available, off-the-shelf software programs), except where the absence of which, individually or in the aggregate, is not reasonably likely to have a Material Adverse Effect.

(b)      To Seller's Knowledge, all issued patents and registrations for trademarks and copyrights included in the Seller's Intellectual Property Rights are subsisting and have not expired or been cancelled.

(c)      To Seller's Knowledge, Seller has implemented commercially reasonable measures to maintain the confidentiality of the Intellectual Property Rights of a nature that Seller intends to keep confidential.

(d)      To Seller's Knowledge, Seller is not in default under any license in any manner that would allow the licensor under any contract to terminate such license or otherwise limit or terminate the rights of Seller under such license.

(e)      To Seller's Knowledge, no third party is infringing, violating or misappropriating any of the Seller's Intellectual Property Rights, except for infringements, violations or misappropriations that, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect.

### 4.5    **LIMITATION ON WARRANTIES.**

EXCEPT AS SET FORTH IN THIS ARTICLE IV, THE SELLER DOES NOT MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE ACQUIRED ASSETS, OR THE ASSUMED LIABILITIES, OR WITH RESPECT TO ANY INFORMATION PROVIDED TO THE BUYER, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, TITLE AND NON-INFRINGEMENT.  ALL OTHER

20

REPRESENTATIONS OR WARRANTIES ARE HEREBY DISCLAIMED. EXCEPT TO THE EXTENT SET FORTH IN THIS ARTICLE IV, THE SELLER IS SELLING, ASSIGNING AND TRANSFERRING THE ACQUIRED ASSETS TO THE BUYER ON AN "AS-IS, WHERE-IS" BASIS. THE REPRESENTATIONS AND WARRANTIES IN THIS ARTICLE IV SHALL NOT SURVIVE CLOSING AND THE BUYER'S ONLY REMEDIES WITH RESPECT TO THE SELLER'S BREACH OF A REPRESENTATION OR WARRANTY SHALL BE TO TERMINATE THIS AGREEMENT PRIOR TO THE CLOSING TO THE EXTENT PERMITTED BY THIS AGREEMENT.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

### 5.1   Organization.

The Buyer is duly organized, formed or incorporated and validly existing and in good standing under the Laws of the state of such organization, formation or incorporation. The Buyer has all requisite power and authority to carry on its business as currently conducted.

### 5.2   Authorization of Transaction.

The Buyer has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, and to perform its obligations hereunder and thereunder. This Agreement constitutes, and each of the Ancillary Documents executed and delivered by the Buyer constitutes, a valid and legally binding obligation of such Party (assuming that this Agreement and such Ancillary Documents will constitute valid and legally binding obligations of the other parties thereto), enforceable in accordance with their terms and conditions, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing.

### 5.3   Noncontravention; Consents.

(a)   The execution and delivery by the Buyer of this Agreement and the Ancillary Documents to which it is a party, and (subject to the Approval Order) the consummation by the Buyer of the transactions contemplated hereby and thereby, do not: (i) violate any Law to which the Buyer or its assets is subject, (ii) conflict with or result in a breach of any provision of any of its organizational or governance documents, or (iii) create a breach, default, termination, cancellation or acceleration of any obligation under any contract, agreement or binding commitment to which such Party is a party or by which such Party or any of its assets or properties is bound or subject.

(b)   No notices, permits, consents, approvals, authorizations, qualifications or orders of Governmental Entities or third parties are required for the consummation by the Buyer of the transactions contemplated hereby or by the Ancillary Documents.

21

**5.4    Litigation.**

There are no legal, administrative, arbitration or other formal proceedings or governmental investigations pending or, to the knowledge of the Buyer, threatened, that question the validity of this Agreement or any of the Ancillary Documents, or any action taken or to be taken by the Buyer in connection with this Agreement or any of the Ancillary Documents.

**5.5    Brokers or Finders.**

No Person is or will become entitled, by reason of any agreement or arrangement entered into or made by or on behalf of the Buyer to receive any commission, brokerage, finder's fee or other similar compensation arrangement in connection with the consummation of the transactions contemplated by this Agreement or the Ancillary Documents.

**5.6    Financing.**

The Buyer has adequate financing from internally-generated sources and has adequate cash on hand, or will have a commitment for adequate financing on or prior to the Closing Date, to enable it to fulfill its obligations under this Agreement and the Ancillary Documents.

**5.7    Buyer's Investigation.**

The Buyer represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Business.   Notwithstanding anything in this Agreement to the contrary, the Buyer acknowledges that it is accepting the Purchased Assets and Assumed Liabilities in their present condition and locations and with their present operating capabilities. The Buyer acknowledges that the Seller makes no warranty, express or implied, as to the condition of the Purchased Assets and Assumed Liabilities, the Business, or otherwise, except as expressly set forth in this Agreement. The Buyer has not relied upon, and the Seller shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Purchased Assets, the Assumed Liabilities, the Business, or otherwise, except as may be contained in this Agreement. The Buyer has inspected, or waived its right to inspect, the Purchased Assets, the Assumed Liabilities and the Business for all purposes and satisfied itself as to their condition. The Buyer is relying solely upon its own inspection of the Purchased Assets, the Assumed Liabilities and the Business, and Buyer shall accept all of the same in their "AS IS", "WHERE IS", condition. Buyer acknowledges that the representations and warranties of the Seller contained in this Article IV of this Agreement constitute the sole and exclusive representations and warranties of the Seller to the Buyer in connection with this Agreement and the Ancillary Documents and the transactions contemplated hereby and thereby, and Buyer acknowledges that all other representations and warranties are specifically disclaimed and may not be relied upon or serve as a basis for a Claim against Seller. The Buyer further acknowledges and agrees that the Seller's representations and warranties shall not survive Closing and that the Buyer's only remedies with respect to the Seller's breach of a representation or warranty shall be to terminate this Agreement prior to the Closing to the extent permitted by this Agreement.

**5.8    Tax.**

The Buyer is not required by any applicable Law, as modified by the practice of any relevant Governmental Entity, to make any deduction or withholding for or on account of any Tax from any payment to be made by it to the Seller under this Agreement.

## ARTICLE VI
## COVENANTS

**6.1    General.**

Each of the Parties will use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done, as soon as practicable, all things necessary, proper or advisable (subject to any Laws) to consummate the Closing and the other transactions contemplated by this Agreement, including the negotiation, execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement or the Ancillary Documents, including any requisite consent, approval, order or authorization of, or declaration from any Governmental Entity. Neither of the Parties will, without prior written consent of the other Party, take or fail to take, or permit their respective Affiliates to take or fail to take, any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the consummation, as soon as possible, of the transactions contemplated by this Agreement or the Ancillary Documents; *provided*, that nothing in this Section 6.1 will require a Party to cure any breach or inaccuracy with respect to any representation or warranty contained in this Agreement or any Ancillary Documents; and *provided further*, that nothing in this Section 6.1 prohibits the consummation of an Alternative Transaction.

**6.2    Excluding or Adding Purchased Assets Prior to Closing.**

Buyer shall have the right to notify Seller in writing of any Purchased Asset that it does not wish to assume or a contract to which Seller is a party that Buyer wishes to add as a Purchased Asset at any time up to one (1) business day prior to the Closing, and (i) any such previously considered Purchased Asset that Buyer no longer wishes to assume shall be automatically deemed removed from the Schedules related to such Purchased Asset and automatically deemed added to the Schedules related to Excluded Assets, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Asset that Buyer wishes to assume as a Purchased Asset shall be automatically deemed added to the Schedules related to such Purchased Asset, automatically deemed removed from the Schedules related to Excluded Assets, and assumed by the Seller to sell and assign to Buyer, in each case, without any adjustment to the Purchase Price. Buyer shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Purchased Assets arising or that are otherwise payable after the Closing.

**6.3    Notices and Consents.**

23

Prior to the Closing Date, the Buyer and the Seller will use commercially reasonable efforts to give all notices required to be given by the Buyer or the Seller and to obtain all material consents, approvals or authorizations of any third parties (including any Governmental Entity) that are required to be obtained by the Seller in connection with the transactions contemplated by this Agreement. In connection with the foregoing, each Party will (a) promptly notify the other Party of any written communication to that Party or its Affiliates from any Governmental Entity and, subject to Law, provide the other Party with a copy of any written communication to any of the foregoing and (b) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning the transactions contemplated by this Agreement unless it consults with the other Party in advance and, to the extent permitted by such Governmental Entity, give the other Party the opportunity to attend and participate thereat, with respect to this Agreement or the Ancillary Documents and the transactions contemplated hereby or thereby. Nothing contained herein will require any Party to pay any consideration (except filing and application fees) to any other Person from whom any such consents, approvals or authorizations are requested.

## 6.4    Effectiveness of Representations and Warranties.

Subject to the restrictions set forth in the Bankruptcy Code or any orders of the Bankruptcy Court, from the date hereof through the Closing Date, each Seller shall use all reasonable efforts to conduct the Business in such a manner so that the representations and warranties contained in Article IV shall continue to be true and correct on and as of the Closing Date as if made on and as of the Closing Date.

## 6.5    Conduct of the Business.

(a)    Subject to any order of the Bankruptcy Court and the requirements of the Bankruptcy Code, the Seller shall ensure that, after the date hereof and prior to the Closing Date, except (x) as expressly provided by or contemplated under this Agreement, (y) as set forth on or (z) with the prior written consent of the Buyer:

(i)    the Seller shall use commercially reasonable efforts under the circumstances to conduct the Business in the ordinary course consistent in all material respects with past practice since the Petition Date;

(ii)    the Seller shall not assume or guarantee the obligations of any other Person;

(iii)    the Seller shall not make any loans, advances or capital contributions to, or investments in, any other Person, other than reimbursement of business expenses to employees in the ordinary course of business consistent with past practice;

(iv)    the Seller shall not sell, transfer, lease, sublease, license, relinquish, surrender, encumber or otherwise dispose of any material Purchased Asset, except for the sale, transfer, lease, sublease, license or other disposition of equipment and inventory in the ordinary course of business; and

24

(v)     the Seller shall conduct the Business in compliance with all Laws in all material respects, and the Seller shall use commercially reasonable efforts under the circumstances to maintain, preserve, renew and keep in full force and effect all material Permits and Intellectual Property Rights included in the Purchased Assets in all material respects.

(b)     Prior to the Closing, the Seller shall use commercially reasonable efforts under the circumstances to preserve intact its business organizations and relationships with third parties relating to the Business and to keep available the services of its respective current officers and key employees, subject to the terms of this Agreement, and in each case, subject to any obligations as a debtor under the Bankruptcy Code or order of the Bankruptcy Court or other court of competent jurisdiction.

**6.6     Tax Sharing Agreements.**

On or prior to Closing, the Seller will terminate all Tax or Income Tax allocation or sharing agreements, if any, to the extent they are related to the Purchased Assets.

**6.7     Access to the Business, Records and Documents.**

(a)     Except as may be prohibited by Law, by the terms of any contract or under any confidentiality or non-disclosure agreement, prior to the Closing (provided, that the Seller has advised the Buyer of the nature of any such restriction and made such disclosure as is permitted), the Seller will (i) upon reasonable notice, permit representatives of the Buyer to have reasonable access during normal business hours and under reasonable circumstances to all personnel, premises, properties, assets, Books, Records, contracts and documents of the Business and (ii) furnish the Buyer with financial and all other information in the Seller's possession relating to the Business, the Purchased Assets and Assumed Liabilities as the Buyer may from time to time reasonably request; *provided,* however that the Buyer may not under any circumstances conduct or cause to be conducted any intrusive or invasive environmental testing at any of the properties of the Seller.

(b)     The Buyer will preserve and maintain all Books and Records included in the Purchased Assets and Assumed Liabilities for a period of two (2) years following the Closing Date. After such two-year period, the Buyer will provide at least sixty (60) days prior written notice to the Seller of its intent to dispose of any such Books and Records, and the Seller and its respective Affiliates will be given the opportunity, at their cost and expense, to remove and retain all or any part of such books and records as they may select. During such two-year period, duly authorized representatives of the Seller and its respective Affiliates will, upon reasonable notice, have reasonable access during normal business hours to examine, inspect and copy such Books and Records; provided that, to the extent that disclosing any such information would reasonably be expected to constitute a waiver of attorney-client, work product or other privilege with respect thereto, the Parties will take all commercially reasonable action to prevent a waiver of any such privilege, including entering into an appropriate joint defense agreement in connection with affording access to such information.

(c)     Seller shall provide reasonable access, or cause to be provided access, during normal business hours to Buyer for a period of thirty (30) days following the Closing Date,

25

at no cost or expense to Buyer other than usual and customary insurance certifications as customarily requested by Seller's landlords, to Seller's business premises in order for Buyer (and its third party moving service provider) to remove the Tangible Personal Property being acquired hereunder.

## 6.8    Publicity.

Following the date hereof, until the Closing or the date the Agreement is terminated or abandoned pursuant to Article IX, the Buyer may not issue or cause the publication of any press release or other general media communication with respect to this Agreement or the transactions contemplated hereby, including communications with the Seller's employees (including organized labor representatives, if any), creditors, customers and suppliers, without the express written consent of the Seller.

## 6.9    Contacts with Suppliers, Customers and Other Parties.

Prior to the Closing, the Buyer and its representatives may, with the consent of the Seller, not to be unreasonably withheld or delayed, contact, and discuss this Agreement and the transactions contemplated hereby with, any supplier to, or customer of, the Business, counterparties to any contracts or any Governmental Entity and, with the participation of the Seller, or any employees of the Seller.

## 6.10    Ancillary Documents.

On or prior to the Closing Date, each of the Buyer and the Seller shall, execute and deliver to the other party thereto the Ancillary Documents to which it is a party.

## 6.11    Confidentiality.

(a)    The Buyer acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 6.7, and the consummation of the transactions contemplated hereby, is subject to the terms of that certain Confidentiality Agreement dated as of November 5, 2024 by and among the Seller and the Buyer (the "*Confidentiality Agreement*"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets or the Assumed Liabilities; *provided, however*, that the Buyer acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller or their respective subsidiaries shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(b)    The Seller has had access to and contributed to information and materials of a highly sensitive nature (including Confidential Information) regarding the Purchased Assets and the Business. The Seller agrees that unless it first secures the written consent of an authorized representative of the Buyer, it shall not use for itself or anyone else, and shall not disclose to others, any Confidential Information except to the extent such use or disclosure is required by Law (in which event it shall inform the Buyer in advance of any such required disclosure, shall cooperate with the Buyer in all reasonable ways in obtaining a protective order or other protection in respect

26

of such required disclosure, and shall limit such disclosure to the extent reasonably possible while still complying with such requirements). The Seller shall use reasonable care to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.

### 6.12 Delivery of Seller Disclosure Schedules.

Notwithstanding anything to the contrary, the Seller shall, deliver the Seller Disclosure Schedules, if any, to the Buyer prior to the Closing Date, and upon such delivery, the Seller Disclosure Schedules shall be incorporated into this Agreement in accordance with Section 10.12 hereof.

### 6.13 Further Assurances.

Each party hereto shall, upon reasonable request of the other party hereto, from time to time, take any and all steps necessary, and will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be required to give effect to this Agreement.

### 6.14 Use of Name.

Immediately following the Closing Date but in no event later than five (5) business days after the Closing Date, Seller shall take all actions necessary to change any fictitious name to a name sufficiently dissimilar to 'Pepper', and shall not be a name which conflicts with Buyer's use of the 'Pepper' name or any derivative thereof and shall not create the impression that Seller remains in the Business. This Section 6.14 shall survive the Closing.

## ARTICLE VII
## EMPLOYEE MATTERS

### 7.1 Employment.

(a) Buyer, in its sole discretion, may offer employment to any of the Seller's Employees identified on Schedule 7.1 after the Closing Date. Employees who accept such offer of employment will be referred to in this Agreement as "*Transferred Employees*." Each of the Transferred Employees shall be collectively referred to herein as "*Continuing Employees*."

### 7.2 Employee Benefit Matters.

(a) Each Transferred Employee will cease participation in any of Seller's Employee Benefit Plan that such Transferred Employees participated in immediately prior to the Closing. Transferred Employees shall be fully vested in their accounts under Seller's Defined Contribution Plan upon their retention.

(b) The provisions of this Article VII are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Continuing Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or

27

3773189v1

remedies (with respect to the matters provided for in this Section 7.2(b) or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 7.2(b), alter or limit Buyer's or Seller's ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

## 7.3    **Defined Contribution Plans.**

As of the Closing Date, with respect to any Defined Contribution Plan of the Seller maintained by or for the benefit of any of the Transferred Employees, the Transferred Employees will cease to participate in such Defined Contribution Plan. As of the Closing Date or as soon as practicable thereafter, each Transferred Employee will be permitted to elect a distribution of his or her account balance in the Defined Contribution Plan of the Seller and will be permitted to roll over his or her account balances in such plan (or any portion thereof) to the Defined Contribution Plan of the Buyer, including the ability to rollover any existing loans under such plan of the Seller for sixty (60) days after the Closing Date. Buyer shall take such actions as may be required with respect to its Defined Contribution Plan to permit and allow timely compliance with this Section 7.3.

## 7.4    **Medical Records; Other Personnel Records; Payroll Deductions.**

Buyer shall obtain from the Transferred Employees their consents to the transfer of their medical and other personnel records and all payroll deduction authorizations from the Seller to the Buyer.

## 7.5    **Wage Reporting.**

The Buyer shall, in accordance with and to the extent permitted by applicable Law, assume all responsibility for preparing and filing each applicable federal, state, or local form with respect to the Transferred Employees after the Closing Date. To the extent required, Seller and the Buyer shall comply, and cause their respective subsidiaries to comply, with the procedures described in Section 5 of U.S. Revenue Procedure 84-77. The obligations of the Buyer under this Section 7.5 shall be an Assumed Liability.

## ARTICLE VIII
## CLOSING CONDITIONS

### 8.1    Conditions to Obligations of the Buyer.

The obligations of the Buyer to effect the Closing are subject to the fulfillment or waiver on or before the Closing Date of the following conditions:

(a)    The representations and warranties of the Seller contained in this Agreement or the Ancillary Documents that are qualified as to materiality or Material Adverse Effect, shall be true and correct and the representations and warranties of Seller contained in this Agreement or

28

the Ancillary Documents that are not so qualified shall be true and correct in all material respects, as of the Closing Date, except for changes therein specifically permitted by this Agreement or the Ancillary Documents and except that representations and warranties made with respect to a specified date need only be true and correct in all material respects as of such date.

(b)     The covenants and agreements contained herein or in any Ancillary Documents to be performed or complied with by the Seller on or prior to the Closing Date shall have been performed or complied with in all material respects.

(c)     With respect to the Limited Objection to Sale filed on October 15, 2024, by Argo Design, LLC, the Bankruptcy Court finally determines, without further appeal, that Seller is the rightful owner of the contested Intellectual Property Rights set forth therein and has all requisite legal rights to transfer the same. The Parties understand that this Section 8.1(c) is a material term of this Agreement and Buyer's obligation to consummate this Agreement and the transactions contemplated hereunder.

(d)     All of the Seller Required Consents shall have been obtained or given, as applicable, and be in full force and effect.

(e)     There shall be no litigation pending or, to the Seller's Knowledge, threatened, in which any injunction is sought to prevent the transactions contemplated hereby, or the transfer of the Purchased Assets to the Buyer, free and clear of all Liens.

(f)     The Seller, as applicable, will have delivered to the Buyer:

(i)     a certificate, dated the Closing Date, duly executed by an officer of the Seller to the effect of Section 8.1(a) and Section 8.1(b) above;

(ii)     a duly executed counterpart of the Bill of Sale, Assignment and Assumption Agreement in a form mutually agreed upon by the Parties (the "*Bill of Sale, Assignment and Assumption Agreement*");

(iii)     a duly executed counterpart of the Patent Assignment and Assumption Agreement in a form mutually agreed upon by the Parties (the "*Patent Assignment and Assumption Agreement*");

(iv)     a duly executed counterpart of the Trademark Assignment and Assumption Agreement in a form mutually agreed upon by the Parties (the "*Trademark Assignment and Assumption Agreement*");

(v)     a duly executed counterpart of the Domain Name Assignment Agreement in a form mutually agreed upon by the Parties (the "*Domain Name Agreement*"); and

(vi)     such other instruments of sale, transfer, conveyance and assignment as the Buyer may reasonably request to effect the transactions contemplated thereby.

(g)     The Bankruptcy Court shall have entered the Approval Order and it shall become a Final Order or the appropriate waivers shall be obtained from the Bankruptcy Court making such order immediately effective.

## 8.2    Conditions to Obligations of the Seller.

The obligations of the Seller to affect the Closing are subject to the fulfillment or waiver on or before the Closing Date of the following conditions:

(a)     The representations and warranties of the Buyer contained in this Agreement or the Ancillary Documents shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of such dates, except for changes therein specifically permitted by this Agreement or the Ancillary Documents.

(b)     The covenants and agreements contained herein or in any Ancillary Document to be performed or complied with by the Buyer on or prior to the Closing Date shall have been performed or complied with in all material respects which shall have been performed in all respects.

(c)     There shall be no litigation pending or, to the Buyer's knowledge, threatened, in which any injunction is sought to prevent the transactions contemplated hereby, or the transfer of the Purchased Assets to the Buyer, free and clear of all Liens.

(d)     The Buyer shall have delivered to Seller:

(i)     the Bill of Sale, Assignment and Assumption Agreement, duly executed by the Buyer;

(ii)    the Patent Assignment and Assumption Agreement, duly executed by the Buyer;

(iii)   the Trademark Assignment and Assumption Agreement, duly executed by the Buyer;

(iv)    the Domain Name Assignment Agreement, duly executed by the Buyer

(v)     Finalized Schedules identifying the Purchased Assets, as set forth herein; and

(vi)    to the Seller such other instruments of sale, transfer, conveyance and assignment as the Seller may reasonably request to effect the transactions contemplated thereby.

(e)     The Bankruptcy Court shall have entered the Approval Order.

(f)     The Buyer shall have delivered to the Seller a certificate, dated the Closing Date, duly executed by an officer of the Buyer to the effect of Section 8.2(a) and Section 8.2(b).

30

## 8.3    Frustration of Closing Conditions.

Neither Seller nor Buyer may rely on the failure of any condition set forth in Section 10.1 or Section 8.2, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE IX
## TERMINATION

## 9.1    Termination of Agreement.

This Agreement may be terminated at any time prior to Closing and the transactions contemplated hereby may be abandoned:

(a)    by the mutual written consent of the Seller and the Buyer;

(b)    by the Seller or the Buyer if any court of competent jurisdiction or governmental body, authority or agency having jurisdiction, including the Bankruptcy Court, shall have issued an order, decree or ruling or taken any other action that is enforceable notwithstanding the automatic stay imposed by Section 362(a) of the Bankruptcy Code (which order, decree, ruling or other action the Parties shall use commercially reasonable efforts to lift) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become a Final Order;

(c)    by the Seller, if there has been a material breach of any of the representations, warranties, agreements or covenants set forth in this Agreement on the part of the Buyer which, if not cured, would reasonably be expected to render the satisfaction of any of the conditions set forth in Section 8.2 impossible and such breach has not been cured within five (5) days following the Seller's written notice of such breach; *provided* that the right to terminate this Agreement under this Section 9.1(c) shall not be available to the Seller if the Seller is in material breach of this Agreement;

(d)    by the Buyer, if there has been a material breach of any of the representations, warranties, agreements or covenants set forth in this Agreement on the part of the Seller which, if not cured, would reasonably be expected to render the satisfaction of any of the conditions set forth in Section 8.1 impossible and such breach has not been cured within five (5) days following the Buyer's written notice of such breach; *provided* that that the right to terminate this Agreement under this Section 9.1(d) shall not be available to the Buyer if the Buyer is in material breach of this Agreement;

(e)    by either Party, upon written notice given to the other Party, if the Closing shall not have occurred on or before December 31, 2024; *provided, however*, that the right to terminate this Agreement under this Section 9.1(e) shall not be available to either Party if such Party has failed to perform in all material respects its obligations under this Agreement and such failure has been the cause of, or results in, the failure of the Closing to occur on or prior to December 31, 2024; and

31

3773189v1

(f)     by the Buyer or the Seller if the Seller enters into an agreement respecting or consummate an Alternative Transaction in the Bankruptcy Cases or enter into or consummate any plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization that is inconsistent with the consummation of the transactions contemplated by this Agreement.

**9.2     Effect of Termination.**

If any Party terminates this Agreement pursuant to Section 9.1 above, all of the unperformed obligations of the Parties hereunder shall terminate without any liability of any Party to such other Party; *provided*, that nothing herein shall relieve any Party from any liability for any breach of this Agreement.  Notwithstanding the foregoing, if the Seller enters into an Alternative Transaction, (i) the Seller may terminate this Agreement without liability to the Buyer, other than the DIP Loan, upon the closing of the Alternative Transaction and (ii) the Buyer's obligations under this Agreement shall not terminate until the closing of such Alternative Transaction.  It is expressly understood and agreed that the Seller's entry into an Alternative Transaction shall not be a breach of this Agreement by the Seller.

## ARTICLE X
## MISCELLANEOUS

**10.1     Survival of Representations and Warranties.**

All of the representations and warranties set forth in this Agreement or in any Ancillary Documents delivered by Seller in connection with the Closing shall survive the execution and delivery of this Agreement and until Closing, but shall not survive Closing and shall terminate upon Closing.

**10.2     Notices.**

Any notice, request, instruction or other document to be given hereunder will be sent in writing and delivered personally, sent by reputable, overnight courier service (charges prepaid), sent by registered or certified mail, postage prepaid, or by electronic mail, according to the instructions set forth below.  Such notices will be deemed given: at the time delivered by hand, if personally delivered; one business day after being sent, if sent by reputable, overnight courier service; at the time received, if sent by registered or certified mail; and at the time when electronic mail is received, if sent by electronic mail.

If to the Seller:                                     Albert Altro
                                                      albertaltro@traversellc.com

With a copy (which will not constitute notice) to:    Sullivan Hazeltine Allinson LLC
919 North Market S., Suite 420
Wilmington, DE 19801
Attention: William Hazeltine
Email: whazeltine@sha-llc.com

If to the Buyer:    Merkury Innovations, LLC
400 Westmont Dr.
San Pedro, CA 90731
Attention: Chaby Orfali
Email: corfali@merkuryinnovations.com

With a copy (which will not constitute notice) to:    Moritt Hock & Hamroff LLP
1407 Broadway, 39th Floor
New York, NY 10018
Attention: Leslie Berkoff, Esq.
Email: lberkoff@moritthock.com

or to such other address or to the attention of such other party that the recipient party has specified by prior written notice to the sending party in accordance with the preceding.

### 10.3 Expenses; No Offset.

Except as expressly provided in this Agreement, each of the Buyer and the Seller will bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby, whether or not such transactions are consummated. Neither Party may make any offset against amounts due to the other Party pursuant to this Agreement, the Ancillary Documents or otherwise. Notwithstanding the foregoing, in the event of any suit or action based on breach of this Agreement, the prevailing party shall be entitled to recover its reasonable costs, including, but not limited to, attorney fees in addition to such other remedies as may be allowed by Law.

### 10.4 Bulk Sales or Transfer Laws.

The Buyer waives compliance by the Seller with the provisions of any bulk sales Laws that may be applicable to the transactions contemplated by this Agreement.

### 10.5 Assignment; Successors and Assigns.

Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by either Party (whether by operation of Law or otherwise) without the prior written consent of the other Party; *provided, however*, that, without the consent of the Seller, the Buyer may assign and delegate its rights under this Agreement to one or more Affiliates of the Buyer; *provided further* that, no such assignment or delegation shall relieve the Buyer of its obligations under this Agreement. Subject to the preceding sentence, and except as otherwise


representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

## 10.12  Exhibits and Schedules.

The Exhibits and Schedules attached to this Agreement are made a part of this Agreement as if set forth fully herein.

## 10.13  Non-Recourse.

No past, present or future director, officer, employee, incorporator, member, partner, equity holder (other than the Seller), lender, agent or representative of Seller shall have any liability for any obligations or Liabilities of the Seller under this Agreement or the Ancillary Documents of or for any Claim, counterclaim, cause of action or demand based on, in respect of, or by reason of, the transactions contemplated hereby and thereby except for any Claim against an individual based on the fraud of such individual in connection with the representations set forth in Article IV and Article V hereof.

## 10.14  Governing Law.

This Agreement shall be governed by and construed in accordance with the Laws of the Delaware (regardless of the Laws that might otherwise govern under applicable Delaware principles of conflicts of Law) as to all matters, including matters of validity, construction, effect, performance and remedies.

## 10.15  Submission to Jurisdiction; Consent to Service of Process.

(a)  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.2 hereof; *provided, however*, that if the Bankruptcy Case has closed, the Parties agree, subject to their respective rights to seek to reopen the Bankruptcy Cases, to unconditionally and irrevocably submit to the exclusive jurisdiction of any state or federal court located in the State of Delaware and any appellate court from any thereof, for the resolution of any such Claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)  Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.2.

35

## 10.16   **WAIVER OF JURY TRIAL.**

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

### 10.17   **United States Dollars.**

All references to "$" in this agreement are to U.S. Dollars. For purposes of computing the value of any item that originally may have been denominated in any foreign currency and subsequently converted to U.S. Dollars, the amount shall be computed by converting the amount expressed in such foreign currency to U.S. Dollars at the official rate for conversion of U.S. Dollars to such foreign currency as published in the *Wall Street Journal* for the day preceding the date on which such item is incurred, paid, or calculated, as the case may be.

[Remainder of page intentionally left blank]

3773189v1

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Asset Purchase Agreement on the date first written above.

**SELLER**:

**SMARTHOME VENTURES, LLC**

By: _____

    Name:   Albert Altro

    Title:    Chapter 11 Trustee to the Seller

**BUYER**:

**MERKURY INNOVATIONS, LLC**

By: _____

Name: Chaby Orfali

Title: Chief Executive Officer and Co-Founder

37

**Schedule 2.2(a)(i)**
**Assumed Contracts**


**To be provided at closing**

Schedule 2.2(a)(ii)
Intellectual Property Rights

Trademarks.

1. Pepper: Registration no. 6,497723
2. PEQ: Registration no. 4,748,961
3. Otis: Registration no. 6,609,741
4. Visi: pending final approval of Statement of Use filing.


Patents.

1. U.S. patent number 11,349,899 - protocol conversion of a video stream (Seller's video streaming related patent)

2. US Patent 10,120,354 - coordinated control of home automation devices (Seller's UI related patent)

**Schedule 2.4
Transferred Contracts**


**To be provided at closing**

<u>Schedule 7.1</u>
Employees

1.  Tim Broyles
2.  Craig Cezar
3.  Cari Chapin
4.  Scott Ford
5.  Matt Jahnke
6.  Mingli Li
7.  Jordan Reinhardt
8.  Brian Ross
9.  Steve Rubenthaler
10. Nicole Sanders
11. Lorn Thomas