**<u>Exhibit 1 to Sale Order</u>**

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**dated as of December 16, 2024**

**by and among**

**Honey Insurance Pty Ltd**

**as Buyer,**

**and**

**Get Notion, LLC,**

**as Seller.**

# TABLE OF CONTENTS

**PAGE**

Article I    DEFINITIONS ................................................................................................ 4

I.1    Construction. ................................................................................................... 11

Article II    PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES ................... 12

II.1    Purchase of Assets.............................................................................................. 12

II.2    Purchased and Excluded Assets. ..................................................................... 12

II.3    Assumed and Excluded Liabilities.................................................................. 15

II.4    Non-assignable Assets....................................................................................... 16

II.5    Notion IP License Agreement .........................................................................

II.6    Wrong Pockets. ................................................................................................. 17

Article III    PURCHASE PRICE AND CLOSING ................................................................ 18

III.1    Closing.............................................................................................................. 18

III.2    Purchase Price. ................................................................................................ 18

III.3    Deposit.............................................................................................................. 18

III.4    Prorations. ....................................................................................................... 19

III.5    Allocation of Purchase Price. ........................................................................ 20

Article IV    REPRESENTATIONS AND WARRANTIES OF THE SELLER ....................... 20

IV.1    Organization. ................................................................................................... 20

IV.2    Authorization of Transaction......................................................................... 20

IV.3    Ownership. ....................................................................................................... 21

IV.4    LIMITATION ON WARRANTIES.................................................................. 21

Article V    REPRESENTATIONS AND WARRANTIES OF THE BUYER ....................... 21

V.1    Organization. ..................................................................................................... 21

V.2    Authorization of Transaction. ......................................................................... 21

V.3    Noncontravention; Consents. ........................................................................... 22

V.4    Litigation. ........................................................................................................... 22

V.5    Brokers or Finders. ........................................................................................... 22

V.6    Financing. ........................................................................................................... 22

1

V.7      Buyer's Investigation. ........................................................................ 22

V.8      Tax. .................................................................................................... 23

Article VI      COVENANTS ......................................................................... 23

VI.1     General. ............................................................................................. 23

VI.2     Notices and Consents. ....................................................................... 24

VI.3     Effectiveness of Representations and Warranties. ............................ 24

VI.4     Conduct of the Business. ................................................................... 24

VI.5     Transfer Taxes. .................................................................................. 25

VI.6     Tax Sharing Agreements. .................................................................. 26

VI.7     Access to the Business, Records and Documents. ............................. 26

VI.8     Publicity. ........................................................................................... 26

VI.9     Contacts with Suppliers, Customers and Other Parties. ................... 27

VI.10    Ancillary Documents. ........................................................................ 27

VI.11    Confidentiality. ................................................................................. 27

VI.12    Delivery of Seller Disclosure Schedules. ......................................... 28

Article VII      CLOSING CONDITIONS .................................................... 28

VII.1    Conditions to Obligations of the Buyer. ........................................... 28

VII.2    Conditions to Obligations of the Seller. ........................................... 29

Article VIII      TERMINATION .................................................................. 31

VIII.1   Termination of Agreement. ............................................................... 31

VIII.2   Effect of Termination. ....................................................................... 32

Article IX      MISCELLANEOUS ............................................................... 32

IX.1     Survival of Representations and Warranties. .................................... 32

IX.2     Notices. .............................................................................................. 32

IX.3     Expenses; No Offset. ......................................................................... 33

IX.4     Bulk Sales or Transfer Laws. ............................................................ 33

IX.5     Assignment; Successors and Assigns. ............................................... 33

IX.6     Amendment; Waiver. ......................................................................... 34

IX.7     Severability; Specific Performance. .................................................. 34

IX.8     Counterparts. ..................................................................................... 34

IX.9     Descriptive Headings. ........................................................................ 34

2

IX.10    No Third-Party Beneficiaries..................................................................... 35

IX.11    Entire Agreement........................................................................................ 35

IX.12    Exhibits and Schedules............................................................................... 35

IX.13    Non-Recourse.............................................................................................. 35

IX.14    Governing Law.  .......................................................................................... 35

IX.15    Submission to Jurisdiction; Consent to Service of Process......................... 35

IX.16    WAIVER OF JURY TRIAL. ....................................................................... 36

IX.17    United States Dollars. ................................................................................. 36

3

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of December 16, 2024 (this "***Agreement***"), is entered into by and between Get Notion, LLC, a Delaware limited liability Company (the "***Seller***"), and Honey Insurance Pty Ltd (the "***Buyer***").

## R E C I T A L S:

**WHEREAS**, the Seller is a DIY smart monitoring system provider empowering home and property owners to be proactive in monitoring their spaces and most valued possessions. (the "***Business***");

**WHEREAS**, on November 4, 2024 (the "***Petition Date***"), the Seller filed a voluntary petition for relief under chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") commencing the Seller's bankruptcy case (Case No. 24-12563 (TMH) (the "***Bankruptcy Case***") in the Bankruptcy Court; and

**WHEREAS**, the Seller desires to sell, transfer and assign to the Buyer, and the Buyer desires to purchase, acquire and assume from the Seller, pursuant to section 363 of the Bankruptcy Code, all of the Purchased Assets, on the terms and subject to the conditions set forth in this Agreement all as more specifically provided herein.

## A G R E E M E N T:

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

### Article I
### DEFINITIONS

**Definitions.** For purposes of this Agreement, the following terms have the meanings set forth below:

"***Accounts Receivable***" has the meaning set forth in Section 2.2(b)(i).

"***Affiliates***" has the meaning set forth in Rule l2b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"***Agreement***" has the meaning set forth in the Preamble.

"***Allocation***" has the meaning set forth in Section 3.5.

4

"*Alternative Transaction*" means the sale, transfer or other disposition of all or a material portion of the Purchased Assets to a third party other than the Buyer or any of its Affiliates in a single transaction or series of related transactions, whether pursuant to a stock or asset sale, share exchange, merger, plan of reorganization, plan of liquidation, recapitalization, business combination or other similar transaction involving any of the Seller, other than sales of Inventory in the ordinary course of business."

"*Ancillary Documents*" means the Bill of Sale, Assignment and Assumption Agreement and each certificate and other document to be delivered pursuant to Article VIII.

"*Apportioned Obligations*" has the meaning set forth in Section 3.4.

"*Approval Order*" means an order from the Bankruptcy Court approving the sale of the Purchased Assets to the Buyer and the conveyance of Permits under this Agreement pursuant to Sections 105, 363(b), 363(f) and 365 of the Bankruptcy Code, and which, among other things, (i) approves the transaction contemplated by this Agreement on the terms set forth herein; (ii) finds that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to the Buyer and shall vest the Buyer with title to the Purchased Assets free and clear of all Liens, other than Permitted Liens, Claims and encumbrances; (iii) finds that the consideration provided by the Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Purchased Assets; (iv) finds that the Buyer is a "good faith buyer" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arm's-length Buyer; (v) finds that this Agreement was negotiated at arm's-length; (vi) finds that the Buyer does not have any interest in the Seller or in any party affiliated with the Seller; (viii) finds that the sale of the Purchased Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code; (ix) approves the Ancillary Documents; (x) finds that the Seller gave due and proper notice of the transaction contemplated by this Agreement to each party entitled thereto; (xi) finds that the Buyer is not a successor of the Seller; and (xii) orders that, notwithstanding Sections 6004(h) and 6006(d) of the Bankruptcy Code, the Approval Order is not stayed and is effective immediately upon entering.

"*Avoidance Actions*" means all avoidance claims under the Bankruptcy Code, including all rights, claims, causes of actions and remedies arising under Bankruptcy Code Sections 329, 502(d), 542, 544, 545, 547, 548, 549, 550, 551 and 553.

"*Bankruptcy Case*" has the meaning set forth in the Recitals.

"*Bankruptcy Code*" means 11 U.S.C. §§101 *et seq*.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

5

"***Bill of Sale, Assignment and Assumption Agreement***" has the meaning set forth in <u>Section 8.1(e)(ii)</u>.

"***Books and Records***" has the meaning set forth in <u>Section 2.2(a)(viii)</u>.

"***Business***" has the meaning set forth in the Recitals.

"***Buyer***" has the meaning set forth in the Preamble.

"***Buyer AWS Payments***" has the meaning set forth in <u>Section 7.2(m).</u>

"***Claim***" means any claim (including any cross-claim or counterclaim), demand, investigation, chose in or cause of action, suit, default, assessment, litigation, third party action, arbitral proceeding or proceeding by or before any Governmental Entity or any other Person.

"***Closing***" has the meaning set forth in <u>Section 3.1</u>.

"***Closing Cash Payment***" has the meaning set forth in <u>Section 3.2(a)(i)</u>.

"***Closing Date***" has the meaning set forth in <u>Section 3.1</u>.

"***COBRA***" has the meaning set forth in <u>Section 7.2(c)</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended (together with all rules and regulations promulgated thereunder).

"***Confidential Information***" means any confidential information with respect to the Business, including, without limitation, methods of operation, customers, customer lists, products, prices, fees, costs, technology, inventions, trade secrets, know-how, software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

"***Defined Contribution Plan***" means a defined contribution plan intended to be qualified under Section 401(a) of the Code.

"***Deposit***" has the meaning set forth in <u>Section 3.3</u>.

"***Effective Time***" has the meaning set forth in <u>Section 3.1</u>.

"***Employees***" has the meaning set forth in <u>Section 7.1</u>.

"***Encryption Key***" means the decryption tools, encryption keys, passphrases and any and all instructions necessary for the Buyer to access and decrypt the Notion Platform and/or the media upon which the Notion Platform is stored.

6

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" has the meaning set forth in <u>Section 3.3</u>.

"*Excluded Assets*" has the meaning set forth in <u>Section 2.2(b)</u>.

"*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; *provided*, *however*, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (14) days of the entry of the order at issue; and *provided further* that, in the case of the Approval Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Buyer, in its sole and absolute discretion, elects to proceed with the Closing.

"*Finished Goods*" means products produced by the Business and in the possession of the Seller that are in final form following the completion of the manufacturing process, but which have not been manufactured for and are not subject to an order from a customer of the Business.

"*GAAP*" means generally accepted accounting principles in the Unites States, as currently applied.

"*Governmental Entity*" means the United States, any state or other political subdivision thereof and any other foreign or domestic entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission, court, tribunal or instrumentality of the United States or any foreign entity, any state of the United States or any political subdivision of any of the foregoing.

"*Income Tax Return*" means, with respect to any Income Tax, any information return for such Income Tax, and any return, report, statement, declaration, claim for refund or document filed or required to be filed under the Law for such Income Tax, and any schedule or attachment thereto or amendment thereof.

"*Income Taxes*" means any federal, state, provincial, local, foreign and other income, alternative minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth or gross receipts taxes or similar governmental charge, including any estimated tax,

7

interest, penalties or additions to tax or additional amounts in respect to the foregoing, including any transferee, successor or secondary liability for any such tax and any liability assumed by agreement or arising as a result of being or ceasing to be a member of any affiliated group, or similar group under state, local or foreign Law, or being included or required to be included in any Income Tax Return relating thereto.

"*Indebtedness*" means, as to any Person, (a) all obligations of such Person for borrowed money (including obligations for reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured) or evidenced by a note, bond, debenture, draft or similar instrument, (b) all obligations of such Person to pay the deferred purchase price of property or services (but excluding accounts payable arising in the ordinary course of business), (c) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (d) all indebtedness created or arising under any capital lease, conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property) and (e) any guaranty of, or any contingent obligation in respect of, any indebtedness or other obligation of any other Person (other than an obligation of another Seller arising out of the conduct of the Business), but only to the extent of the obligation guaranteed.

"*Intellectual Property Rights*" means all United States and foreign: (a) trademarks, service marks, trade names, trade dress, domain names, copyrights and similar rights, including all goodwill associated with the foregoing and registrations and applications to register or renew the registration of any of the foregoing, (b) all United States and foreign patents (including design patents, industrial designs and utility models) and patent applications (including docketed patent disclosures awaiting filing, provisionals, reissues, revisions, divisions, continuations, continuations-in-part, extensions and re-examinations), patent disclosures awaiting filing determination, and improvements thereto, inventions (whether patentable or unpatentable and whether or not reduced to practice), and improvements thereto, processes, designs, formulae, trade secrets, know-how, ideas, research and development, manufacturing and production processes and techniques, technical data and other, copyrightable works, engineering notebooks, databases and compilations, customer lists and Confidential Information, (c) software, firmware, Internet Web sites (including the content thereof), (d) all similar intellectual property rights (including moral rights), (e) all rights to sue for and remedies against past, present and future infringements of any or all of the foregoing, (f) rights of priority and protection of interests therein under the Laws of any jurisdiction, and tangible embodiments of any of the foregoing (in any medium including electronic media), (g) rights currently held by the Seller to use or access the intellectual property rights, resources or services of any third parties and are necessary to use or operate the Notion Platform, including but not limited to any rights held in accounts with Amazon Web Services, Apple, Google and Microsoft and (h) licenses of any of the foregoing.

8

"***Inventory***" has the meaning set forth in <u>Section 2.2(a)(i)</u>.

"***Law***" means any applicable federal, state, local or foreign law, statute, common law, rule, regulation, ordinance, permit, order, writ, injunction, judgment or decree of any Governmental Entity.

"***Liability***" means any direct or indirect, primary or secondary, liability, Indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), Claim, deficiency, guaranty or endorsement (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the ordinary course of business) of any type, whether accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate matured or unmatured, or otherwise including any Liens securing the foregoing.

"***Lien***" means any pledge, security interest, charge, Claim or other lien.

"***Material Adverse Effect***" means a material adverse effect on the business, results of operations or condition (financial or otherwise) of the Business and the Purchased Assets taken as a whole; *provided*, *however*, that "***Material Adverse Effect***" will not include, and the determination of the existence of a Material Adverse Effect shall not take into account, any of the following: (i) any failure by the Seller to meet any projections, forecasts or predictions of revenue, earnings or other measures of financial performance; (ii) any change, event, circumstance or effect attributable to general economic conditions in the United States or any foreign jurisdiction in which the any Seller has operations or sales; (iii) any change, event, circumstance or effect attributable to conditions affecting the industries in which the Business operates; (iv) any change, event, circumstance or effect attributable to financial, banking or securities markets generally (including changes in interest rates or any market indices); (v) any change or proposed change in any Laws affecting the Business or the Purchased Assets or the interpretation thereof; (vi) any change in accounting rules; (vii) any change or proposed change, event, circumstance or effect attributable to the announcement of the transactions contemplated hereby, including any potential or actual disruption of customer demand or purchase orders, or relationships with Employees, customers, business partners, suppliers or other constituencies; (viii) any change, event, circumstance or effect attributable to compliance with the terms of, or the taking of any action required by, this Agreement or otherwise taken or not taken at the request of Buyer; or (ix) any change, event, circumstance or effect attributable to national or international political or social conditions, including the outbreak of war or international hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such war, hostilities, acts of war, sabotage or terrorism or military actions, whether in the United States or elsewhere.

"***Notion IP License Agreement***" means the intellectual property license agreement between the Seller and the Buyer dated 25 October 2024.

9

"**Notion Platform**" means the Seller's core smart monitoring IoT platform, being the application, marketing, communications and reporting platform known as 'Notion' (or such other name as amended from time to time), designed to proactively monitor an end-user's space and possessions, and communicate with such end-users on an on-going basis.

"**Nonassignable Asset**" has the meaning set forth in Section 2.4(a).

"**OSHA**" means the Occupational Safety and health Act of 1970, as amended.

"**Parties**" means the Seller and the Buyer together, and "**Party**" means the Seller, on the one hand, or the Buyer, on the other hand, as the case may be.

"**Permits**" has the meaning set forth in Section 2.2(a)(vi).

"**Permitted Liens**" means any (a) mechanics', materialmens' and similar Liens arising in the ordinary course of business with respect to amounts not yet due and payable, (b) Liens for Taxes not yet due and payable, and (c) Liens or imperfections in or failure of title which do not materially detract from the value of the assets or property subject thereto.

"**Person**" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Entity, whether foreign or domestic.

"**Post-Closing Period**" has the meaning set forth in Section 3.4.

"**Pre-Closing Period**" has the meaning set forth in Section 3.4.

"**Purchase Price**" has the meaning set forth in Section 3.2(a).

"**Purchased Assets**" has the meaning set forth in Section 2.2(a).

"**Seller**" has the meaning set forth in the Preamble.

"**Seller's Employee Benefit Plan**" means each employee pension benefit plan within the meaning of Section 3(2) of ERISA, employee welfare benefit plan within the meaning of Section 3(1) of ERISA, fringe benefit plan and other incentive compensation or bonus programs, policies and arrangements, whether or not subject to ERISA, that the Seller or any of their Affiliates maintain with respect to the current or former employees of the Business or to which the Seller or any of its Affiliates contributes or has any obligation to contribute with respect to the current or former employees of the Business.

"**Seller's Knowledge**" means the actual knowledge of Albert Altro, Scott Ford and David Bottoms

10

"***Tangible Personal Property***" has the meaning set forth in <u>Section 2.2(a)(iv)</u>.

"***Tax***" or "***Taxes***" means a tax or taxes of any kind or nature, or however denominated, including liability for federal, state, provincial, local, foreign or other sales, use, transfer, registration, business and occupation, value added, excise, severance, stamp, premium, windfall profit, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax or similar governmental charge, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect to the foregoing, including any transferee, successor or secondary liability for a tax and any liability assumed by agreement or arising as a result of being or ceasing to be a member of any affiliated group, or similar group under state, local or foreign Law, or being included or required to be included in any Tax Return relating thereto; *provided*, *however*, that "Tax" or "Taxes" will not include any Income Taxes.

"***Tax Returns***" means, with respect to any Tax, any information return for such Tax, and any return, report, statement, declaration, claim for refund or document filed or required to be filed under the Law for such Tax, any schedule or attachment thereto or amendment thereof.

"***Transfer Taxes***" has the meaning set forth in <u>Section 6.5</u>.

"***Transferred Employees***" has the meaning set forth in <u>Section 7.1</u>.

"***Treasury Regulation***" means the final or temporary regulations promulgated under the Code, in effect from time to time.

"***Trustee***" means the Chater 11 Trustee as defined in the Approval Order.

"***Trustee AWS Payments***" has the meaning set forth in <u>Section 7.1(i)</u>.

**I.2**   <u>**Construction**</u>.

(a)   For purposes of this Agreement, whenever the context requires, the singular will include the plural, and vice versa, the masculine gender will include the feminine and neuter genders, the feminine gender will include the masculine and neuter genders, and the neuter gender will include masculine and feminine genders.

(b)   As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation."

(c)   Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections and Exhibits to this Agreement.

11

(d)     As used in this Agreement, the terms "hereof," "hereunder," "herein" and words of similar import will refer to this Agreement as a whole and not to any particular provision of this Agreement.

(e)     Each Party hereto has participated in the drafting of this Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties.  Consequently, this Agreement will be interpreted without reference to any rule or precept of Law to the effect that any ambiguity in a document be construed against the drafter.

**Article II**
**PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**

**II.1     Purchase of Assets.**

On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Buyer will purchase from the Seller, and the Seller will sell, assign, convey and deliver to the Buyer, free and clear of any Liens or Claims or encumbrances other than Permitted Liens, the Purchased Assets.

**II.2     Purchased and Excluded Assets.**

(a)     **Purchased Assets**.  The "***Purchased Assets***" are all of the right, title and interest that the Seller possesses in and to all of the following assets (other than the Excluded Assets), as the same may exist as of the Effective Time:

(i)     Tangible Personal Property.  All tangible personal property related or used in any way in and to the Business, wherever located, including, but not limited to, all machinery, equipment, and test equipment;

(ii)     Intellectual Property Rights.  All Intellectual Property Rights of the Seller used or held for use in connection with the Business, including all Intellectual Property Rights in the Notion Platform (including source code and object code in the Notion Platform); and all data that is held within any systems and cloud-computing services hosted or utilized by the Seller for the purposes of the Notion Platform application and service, Intellectual Property Rights in the tools or applications used by the Seller to support the Notion Platform, Intellectual Property Rights in the device firmware for all bridge and sensor versions related to the Notion Platform, and any other software (in any form, including source code and object code);

(iii)     Permits.  All approvals, agreements, authorizations, permits, licenses, easements, orders, certificates, registrations, franchises, qualifications, leases, rulings, waivers, variances or other forms of permission, consent, exemption or authority issued, granted, given or otherwise made available by or under the authority of any Governmental Entity, which

12

are used or held for use in connection with the ownership, conduct or operation of the Purchased Assets by the Seller(the "***Permits***");

    (iv) <u>Books and Records</u>.   All books, records, tools or applications (including those developed, created or used by the Seller to support the Notion Platform), methodologies, software (in any form, including source code and object code), ledgers, files, operation manuals, user manuals, user guides, training materials, instructions, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports, technology architecture (including any schematics, designs, drawings and detailed bill of materials associated with the Notion Platform) and other materials (in whatever form or medium) of the Seller, including Tax books and records and Tax Returns of the Seller used or held for use in connection with the ownership, operation or conduct of the Business or the Purchased Assets, including source code in any of the forgoing, customer lists, customer information and account records, computer files, documentation that is necessary for the commercialization of the Intellectual Property Rights of the Seller used or held for use in connection with the Business, the iOS and Android applications used by end-users to access and use, the Notion Platform, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers and other data (collectively, the "***Books and Records***"); *provided*, that the Seller may retain copies of the foregoing for administrative purposes;

    (v) <u>Warranty Rights</u>.   All rights under all warranties, representations and guarantees made by suppliers, manufacturers and contractors with respect to the Purchased Assets;

    (vi) <u>Goodwill</u>.   All goodwill arising in connection with ownership, operation or conduct of the Purchased Assets.

    (b) **Excluded Assets**.   Notwithstanding anything to the contrary contained in <u>Section 2.2(a)</u>, the Seller will retain all of its right, title and interest in and to, and will not sell, transfer, assign, convey or deliver to the Buyer, and the Purchased Assets will not include, the following (collectively, the "***Excluded Assets***"):

    (i) All accounts and notes receivable and other such Claims for money due to the Seller, arising from pre-Closing transactions, including such items arising from the rendering of services or the sale of goods or materials together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefore, including recoverable deposits, and including such Claims for money due to the Seller where legal action has been taken against trade debtors in order to recover such Claims (the "***Accounts Receivable***");

13

(ii)    <u>Cash</u>.  Any cash or cash equivalents, including any marketable securities or certificates of deposit, or any collected funds or items in the process of collection at the Seller's financial institutions (but such items in process shall only be excluded if already applied to reduce the amount of accounts receivables relating thereto) through and including the Closing;

(iii)    <u>Intercompany Debt</u>.  All Indebtedness owed to any Seller by any Seller or any affiliate of any Seller.

(iv)    <u>Causes of Action</u>.  Any Claims and causes of action against any third party, including Avoidance Actions, and all proceeds thereof;

(v)    <u>Equity Interests</u>.  All equity interests in other Persons owned by the Seller.

(vi)    <u>Tax Claims</u>.  (A) Any rights of the Seller or any of their respective Affiliates with respect to any Income Tax refunds, credits, rebates or abatements, or to any Tax refunds, credits or abatements with respect to assets that are not Purchased Assets; (B) subject to <u>Section 3.4</u>, any rights to credits, refunds, rebates or abatements of Taxes with respect to the Purchased Assets relating to periods (or portions thereof) ending on or prior to the Closing; (C) any Income Tax Returns and Income Tax records of the Seller or any of their respective Affiliates, and any Tax Returns or Tax records of the Seller or any of their Affiliates that relate to the Excluded Assets, and (D) any rights of the Seller or any of their respective Affiliates under any Tax or Income Tax allocation or sharing agreement;

(vii)    <u>Insurance Policies</u>.  All insurance policies of the Seller and all rights thereunder, including, without limitation, any and all insurance refunds or Claims made under such policies relating to the Purchased Assets on or before the Closing Date;

(viii)    <u>Prepaid Expenses</u>.  All credits, prepaid expenses, deferred charges, advance payments, security deposits, utility deposits, deposits with landlords, prepaid items, deposits and Claims for refunds or reimbursements, security deposits made in connection with the Bankruptcy Cases, and the like, as listed on <u>Schedule 2.2(b)(vi)</u>;

(ix)    <u>Corporate Documents</u>.  The corporate charters, limited liability company agreements, qualifications to conduct business as foreign Persons, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates, books and records relating to Income Taxes, and any other documents relating to the organization, maintenance and existence of the Seller as corporations or limited liability companies, as applicable;

(x)    <u>Avoidance Actions</u>.  Any Avoidance Actions of the Seller or an Affiliate of the Seller, including all proceeds thereof;

14

(xi)    <u>Employee Benefit Plans</u>.  Except as otherwise specifically provided in this Agreement, any Seller's Employee Benefit Plan and corresponding assets or any rights of a Seller or any of its Affiliates in each Seller's Employee Benefit Plan provided by a Seller to the Employees;

(xii)    <u>Seller's Rights</u>.  Any rights of the Seller under this Agreement, any Ancillary Document or any other agreement between any Seller and the Buyer;

(xiii)    <u>Excluded Assets and Excluded Liabilities Rights</u>.  Any rights, Claims or legal actions of the Seller relating to any of the Excluded Assets or Excluded Liabilities;

(xiv)    <u>Excluded Contracts</u>.  Any contract (including any post-petition contracts) to which the Seller are a party that is not a Permit; and

(xv)    <u>Other Excluded Assets</u>.  Any other assets, rights and properties identified on <u>Schedule 2.2(b)(xiv)</u>.

**II.3    <u>Assumed and Excluded Liabilities</u>.**

(a)    <u>Assumed Liabilities</u>.  The "*Assumed Liabilities*" include and are limited to the following:

(i)    <u>Operating Liabilities</u>.  All Claims, Liabilities, responsibilities, obligations, costs and expenses arising in any way out of the operation of the Business or the ownership or operation of the Purchased Assets on or after the Closing Date, including, without limitation, (A) any and all Taxes arising out of or attributable to the operation or ownership of the Purchased Assets on or after the Closing Date, (B) any and all Claims associated with the use of the Purchased Assets, including Liability to any third party for any injury or damage to persons or property and any damage to the asset itself, due to any condition of, defect in, or design of the asset in question, latent or otherwise, to the extent that such condition, defect, or design occurs on or after the Closing Date, and (C) any and all warranty obligations or Claims relating to warranties provided to customers of the Business on or after the Closing Date.

(ii)    <u>Post-Closing Liabilities</u>.  All Liabilities relating to the Purchased Assets that arise from events, facts or circumstances that occur after the Closing Date; and

(iii)    <u>Post-Closing Tax Liabilities</u>.  All Liabilities (including Liabilities for Income Taxes of the Buyer (other than any transferee, successor or secondary Liability for Income Taxes of the Seller) and Taxes with respect to the Purchased Assets for periods (or portions thereof) ending after the Closing) incurred, accrued or arising after the Closing in connection with the conduct or operation of the Business or the use or ownership of the Purchased Assets after the Closing.

15

(b)     Excluded Liabilities.  The Buyer will not assume or become responsible for, and will not be deemed to have assumed or to have become responsible for any Liabilities and obligations arising or incurred in or otherwise relating to the period up to and including the Closing Date, including but not limited to the following Liabilities and obligations of the Seller (collectively the "***Excluded Liabilities***"):

(i)     Excluded Contract Liabilities.  Any Liabilities arising under any contracts, agreements, leases and commitments, including but not limited to any Liabilities owed to Amazon Web Services or any other contractual counterparty;

(ii)     Excluded Employment Liabilities.  Any Liabilities of the Seller not assumed by the Buyer pursuant to Section 2.3(a)(iii), Section 2.3(a)(iv), or Article VII of this Agreement, related to any Seller's Employee Benefit Plan, whether or not such Liability or obligation arises prior to, on or after the Closing Date;

(iii)     Other Excluded Employment Liabilities.  Except as otherwise provided in this Agreement, any other Liability of the Seller relating to the employment or termination of employment of any (A) Employee arising from or related to the operation of the Business of the Seller prior to the Closing of the transactions contemplated by this Agreement (including any severance policy, plan, agreement or program which exists or arises, or may be deemed to exist or arise, as a result of, or in connection with, the transactions contemplated by this Agreement), or (B) individual who is not a Transferred Employee arising on or after the Closing Date; and

(iv)     Excluded Tax Liabilities.  Any Liabilities relating to (A) Income Taxes of the Seller (including Income Taxes payable by reason of the transactions contemplated by this Agreement); (B) Taxes of the Seller with respect to Excluded Assets; (C) all Taxes and Transfer Taxes with respect to the Purchased Assets for periods (or portions thereof) ending on or before the Closing Date; and (D) any Tax or Income Tax allocation or sharing agreement to which any of the Seller is a party.

(v)     Other Excluded Liabilities.  Any other Liabilities of the Seller.

**II.4     Non-assignable Assets.**

(a)     Notwithstanding anything to the contrary, nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset (including any Permit) to the Buyer which by its terms or by Law is not assignable or transferable without the consent of a third party or a Governmental Entity or is cancelable by a third party in the event of an assignment or transfer (a "***Nonassignable Asset***"), unless and until such consent shall have been obtained or unless such consent is not required by virtue of the Bankruptcy Code.

16

(b)     The Seller and the Buyer shall each use commercially reasonable efforts to obtain as expeditiously as possible any consent that may be required for the assignment or transfer of a Nonassignable Asset to the Buyer; *provided, however,* that neither the Seller nor the Buyer shall be required to make any payment to obtain any such consent with respect to any Nonassignable Asset.

**II.5**     **Notion IP License Agreement**.

The Seller and the Buyer hereby agree that:

(a)     the Notion IP License Agreement will be terminated by mutual agreement with effect from Closing;

(b)     no further payments or other amounts are payable by any party under the Notion IP License Agreement; and

(c)     any accrued rights or remedies under the Notion IP License Agreement are fully extinguished.

**II.6**     **Wrong Pockets**.

(a)     To the extent that:

(i)     the legal title to or the beneficial interest in any Purchased Asset has not been transferred to, or assumed by, the Buyer at Closing ("***Missing Asset***"); or

(ii)     any Excluded Liabilities have been transferred to, or assumed by, the Buyer at Closing,

this Section 2.6 will apply.

(b)     Following the Closing, the Seller must:

(i)     promptly notify the Buyer upon it becoming aware that there are any Missing Assets in the possession or ownership of the Seller or an Affiliate of the Seller, or that any Excluded Liabilities have been transferred to, or assumed by, the Buyer (as the case may be);

(ii)     unless the Buyer agrees otherwise, as soon as practicable and on terms that no consideration is provided by any person for such transfer (and inclusive of net economic benefits accrued in respect of the period following Closing but free of any Lien, Claim or encumbrance created after Closing), transfer or procure the transfer of the Missing Assets to the Buyer (as the case may be);

17

        (iii)    as soon as practicable transfer or assume or procure the transfer to or assumption of the Excluded Liabilities by the Seller; and

        (iv)    execute all documents and do or procure to be done all such further reasonable acts or things as may be necessary to give effect to such transfer or assumption.

## Article III
## PURCHASE PRICE AND CLOSING

**III.1**   **Closing.**

The closing of the transactions contemplated by this Agreement (the "***Closing***") will occur as promptly as practicable, but in no event (i) more than 3 business days following the satisfaction and/or waiver of all conditions to Closing set forth in Article VIII (other than any of such conditions that by its nature is to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and (ii) no later December 30, 2024, at the offices of Sullivan Hazeltine Allinson LLC, 919 N. Market St. Street, Suite 420, Wilmington, DE 19801, or at such other place on such other date as the Parties may agree in writing. The Closing may take place remotely.  The date on which the Closing actually occurs will be referred to as the "***Closing Date***," and the Closing will be deemed effective as of 10:00 a.m., Eastern Daylight time, on the Closing Date (the "***Effective Time***").

**III.2**   **Purchase Price**.

        (a)    The purchase price for the Purchased Assets shall be as follows (collectively, the "***Purchase Price***"):

        (i)    an amount of cash equal to $740,000 (the "***Closing Cash Payment***"), payable by the Buyer at Closing by wire transfer of immediately available funds to the Seller;

less

        (ii)    the aggregate amount of the Trustee AWS Payments; and

less

        (iii)    the Deposit, which shall be released and delivered by the Escrow Agent to Seller, on behalf of all Seller, in accordance with Section 3.3.

**III.3**   Deposit.

Promptly, but in no event more than two business days after the date hereof, the Buyer shall deliver by wire transfer an amount equal to $10,000, to Sullivan Hazeltine Allinson LLC (the

18

"*Escrow Agent*"), as an earnest money deposit hereunder (the "*Deposit*").  The Deposit shall be held in escrow by the Escrow Agent in a segregated of a federally insured commercial bank and disbursed only in accordance with the terms of this Agreement.  If the Closing takes place, the Escrow Agent shall deliver the Deposit to the Seller, at the Closing as partial payment of the Purchase Price.  If this Agreement is terminated or becomes null and void for any reason other than the Buyer's material breach of its obligations hereunder, including if the Bankruptcy Court does not enter the Approval Order, the Seller's material breach of their obligations hereunder, any of the conditions set forth in <u>Section 8.1</u> shall not have been satisfied, or the Seller shall, have entered into an Alternative Transaction (provided in each case that the Buyer has not materially breached this Agreement), the Deposit shall be paid to the Buyer.  If this Agreement is terminated by the Seller by reason of the Buyer's breach of its obligations hereunder, the Deposit shall be paid to the Seller as liquidated damages and not a penalty <u>provided</u>, <u>however</u>, that that the Buyers' liability for any breach of its obligations hereunder shall not be limited to the amount of the Deposit.  Notwithstanding the foregoing in this <u>Section 3.3</u>, the Escrow Agent shall not disburse the Deposit until the earlier to occur of (i) receipt by the Escrow Agent of joint written instructions, signed by the Seller and the Buyer, or (ii) entry of a Final Order of the Bankruptcy Court determining which Party is entitled to receive the Deposit.  In the event of a dispute between the Parties with respect to the Deposit, the Escrow Agent may deposit the Deposit with the Bankruptcy Court and commence an action to determine the proper disposition of such Deposit.  The Parties hereto agree that, for federal income tax reporting purposes, the Buyer shall be the owner of the Deposit.

### III.4    <u>Prorations</u>.

All Taxes and all rents, utilities and other charges against, or payable with respect to, any of the Purchased Assets (including the Real Property) relating to a time period beginning prior to, and ending after, the Closing (the "*Apportioned Obligations*") shall be calculated as of Closing, and shall be prorated (based on the most recent available tax statement, latest tax valuation and latest bills) based on the number of days in the relevant period falling on and before the Closing (the "*Pre-Closing Period*"), and the number of days in the relevant period falling after the Closing (the "*Post-Closing Period*").  If the Closing occurs before the amount of an Apportioned Obligation is fixed for a relevant time period, the amount of such Apportioned Obligation shall be deemed to be calculated based on the amount of such Apportioned Obligation for the prior equivalent time period.  The Seller will be responsible for the Apportioned Obligations allocated to the Pre-Closing Period, and the Buyer will be responsible for the Apportioned Obligations allocated to the Post-Closing Period.  The Seller will pay Apportioned Obligations that are due and payable on or prior to the Closing Date, and such amount will be paid at Closing by the Seller for any part of that amount apportioned to the Seller.  The Buyer will pay Apportioned Obligations that are due and payable after the Closing Date, and such amount will be paid at Closing by the Buyer for any part of that amount apportioned to the Buyer.  Any refund, rebate or similar payment received by or credited to either the Buyer or the Seller that is properly apportioned to the other Party pursuant to the principles of this <u>Section 3.4</u> will be timely paid over to such other Party.

19

### III.5    Allocation of Purchase Price.

The Seller and the Buyer will attempt in good faith to agree upon the allocation of the Purchase Price, and all costs among the Purchased Assets (the "*Allocation*") prior to the Closing Date, solely for Income Tax purposes in accordance with the provisions of Section 1060 of the Code and any other applicable provisions of Law.  If such an agreement is reached, the Seller and the Buyer will file all required Tax Returns and Income Tax Returns consistent with such Allocation, and not take any inconsistent position for any Income Tax or Tax purpose, unless otherwise required to do so by a change of Law or good faith resolution of a contest.  If such an agreement is not reached, then the Seller and the Buyer will adopt the Seller's reasonably proposed allocation.  Notwithstanding the foregoing, the Allocation for Income Tax purposes shall not be binding on any party in interest for purposes of determining distributions in connection with the liquidation of the Seller's bankruptcy estates.

### Article IV
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the Schedule of the Seller Disclosure Schedules corresponding to the respective Section of this Article IV, the Seller hereby represents and warrants to the Buyer as follows:

### IV.1    Organization.

The Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.  The Seller is duly qualified or licensed to do business as a foreign entity and is in good standing in each jurisdiction in which the ownership or lease of the Purchased Assets or the conduct of the Business requires such qualification or license, except where the failure to be so qualified or be so licensed would not reasonably be expected to result in a Material Adverse Effect.  The Seller has all requisite corporate or limited liability company power and authority to carry on the Business as currently conducted and to own, lease or use, as the case may be, the Purchased Assets in connection herewith.

### IV.2    Authorization of Transaction.

Subject to entry of the Approval Order, the Seller has all requisite limited liability company power and authority to execute, deliver and perform this Agreement and each of the Ancillary Documents to which it is a party and to perform its obligations hereunder and thereunder.  Subject to entry of the Approval Order, this Agreement constitutes, and each of the Ancillary Documents when executed and delivered by such Seller will constitute a valid and legally binding obligation of the Seller (assuming that this Agreement and such Ancillary Documents constitute valid and legally binding obligations of the other parties thereto), enforceable in accordance with its terms and conditions, except as enforceability may be limited by applicable bankruptcy, insolvency,

reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights, or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing.

**IV.3**   **Ownership.**

The Seller has good and marketable title to the Purchased Assets.

**IV.4**   **LIMITATION ON WARRANTIES.**

EXCEPT AS SET FORTH IN THIS ARTICLE IV, THE SELLER DOES NOT MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE ACQUIRED ASSETS, OR WITH RESPECT TO ANY INFORMATION PROVIDED TO THE BUYER, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, TITLE AND NON-INFRINGEMENT.  ALL OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY DISCLAIMED.  EXCEPT TO THE EXTENT SET FORTH IN THIS ARTICLE IV, THE SELLER IS SELLING, ASSIGNING AND TRANSFERRING THE ACQUIRED ASSETS TO THE BUYER ON AN "AS-IS, WHERE-IS" BASIS FREE OF ANY LIENS, CLAIMS OR ENCUMBRANCES. THE REPRESENTATIONS AND WARRANTIES IN THIS ARTICLE IV SHALL NOT SURVIVE CLOSING AND THE BUYER'S ONLY REMEDIES WITH RESPECT TO THE SELLER'S BREACH OF A REPRESENTATION OR WARRANTY SHALL BE TO TERMINATE THIS AGREEMENT PRIOR TO THE CLOSING TO THE EXTENT PERMITTED BY THIS AGREEMENT.

**Article V**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller as follows:

**V.1**   **Organization.**

The Buyer is duly organized, formed or incorporated and validly existing and in good standing under the Laws of the state of such organization, formation or incorporation.  The Buyer has all requisite power and authority to carry on its business as currently conducted.

**V.2**   **Authorization of Transaction.**

The Buyer has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, and to perform its obligations hereunder and thereunder.  This Agreement constitutes, and each of the Ancillary Documents executed and delivered by the Buyer constitutes, a valid and legally binding obligation of such Party (assuming that this Agreement and such Ancillary Documents will constitute valid and legally binding

21

obligations of the other parties thereto), enforceable in accordance with their terms and conditions, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing.

### V.3    Noncontravention; Consents.

(a)    The execution and delivery by the Buyer of this Agreement and the Ancillary Documents to which it is a party, and (subject to the Approval Order) the consummation by the Buyer of the transactions contemplated hereby and thereby, do not: (i) violate any Law to which the Buyer or its assets is subject, (ii) conflict with or result in a breach of any provision of any of its organizational or governance documents, or (iii) create a breach, default, termination, cancellation or acceleration of any obligation under any contract, agreement or binding commitment to which such Party is a party or by which such Party or any of its assets or properties is bound or subject.

(b)    No notices, permits, consents, approvals, authorizations, qualifications or orders of Governmental Entities or third parties are required for the consummation by the Buyer of the transactions contemplated hereby or by the Ancillary Documents.

### V.4    Litigation.

There are no legal, administrative, arbitration or other formal proceedings or governmental investigations pending or, to the knowledge of the Buyer, threatened, that question the validity of this Agreement or any of the Ancillary Documents, or any action taken or to be taken by the Buyer in connection with this Agreement or any of the Ancillary Documents.

### V.5    Brokers or Finders.

No Person is or will become entitled, by reason of any agreement or arrangement entered into or made by or on behalf of the Buyer to receive any commission, brokerage, finder's fee or other similar compensation arrangement in connection with the consummation of the transactions contemplated by this Agreement or the Ancillary Documents.

### V.6    Financing.

The Buyer has adequate financing from internally-generated sources and has adequate cash on hand, or will have a commitment for adequate financing on or prior to the Closing Date, to enable it to fulfill its obligations under this Agreement and the Ancillary Documents.

### V.7    Buyer's Investigation.

22

The Buyer represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Business. Notwithstanding anything in this Agreement to the contrary, the Buyer acknowledges that it is accepting the Purchased Assets in their present condition and locations and with their present operating capabilities. The Buyer acknowledges that the Seller makes no warranty, express or implied, as to the condition of the Purchased Assets, or otherwise, except as expressly set forth in this Agreement. The Buyer has not relied upon, and the Seller shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Purchased Assets, or otherwise, except as may be contained in this Agreement. The Buyer has inspected, or waived its right to inspect, the Purchased Assets, for all purposes and satisfied itself as to their condition. The Buyer is relying solely upon its own inspection of the Purchased Assets, and Buyer shall accept all of the same in their "AS IS", "WHERE IS", condition. Buyer acknowledges that the representations and warranties of the Seller contained in this Article IV of this Agreement constitute the sole and exclusive representations and warranties of the Seller to the Buyer in connection with this Agreement and the Ancillary Documents and the transactions contemplated hereby and thereby, and Buyer acknowledges that all other representations and warranties are specifically disclaimed and may not be relied upon or serve as a basis for a Claim against any Seller. The Buyer further acknowledges and agrees that the Seller's representations and warranties shall not survive Closing and that the Buyer's only remedies with respect to the Seller's breach of a representation or warranty shall be to terminate this Agreement prior to the Closing to the extent permitted by this Agreement.

### V.8    Tax.

The Buyer is not required by any applicable Law, as modified by the practice of any relevant Governmental Entity, to make any deduction or withholding for or on account of any Tax from any payment to be made by it to the Seller under this Agreement.

## Article VI
## COVENANTS

### VI.1    General.

Each of the Parties will use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done, as soon as practicable, all things necessary, proper or advisable (subject to any Laws) to consummate the Closing and the other transactions contemplated by this Agreement, including (a) the filing and recording of any Intellectual Property Rights that are Purchased Assets (including the Notion IP License Agreement) with the United States Patent and Trademark Office and (b) the negotiation, execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement or the Ancillary Documents, including any requisite consent, approval, order or authorization of,

23

or declaration from any Governmental Entity.  Neither of the Parties will, without prior written consent of the other Party, take or fail to take, or permit their respective Affiliates to take or fail to take, any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the consummation, as soon as possible, of the transactions contemplated by this Agreement or the Ancillary Documents; *provided*, that nothing in this <u>Section 6.1</u> will require a Party to cure any breach or inaccuracy with respect to any representation or warranty contained in this Agreement or any Ancillary Documents.

**VI.2     <u>Notices and Consents</u>.**

Prior to the Closing Date, the Buyer and the Seller will use commercially reasonable efforts to give all notices required to be given by the Buyer or the Seller and to obtain all material consents, approvals or authorizations of any third parties (including any Governmental Entity) that are required to be obtained by the Seller in connection with the transactions contemplated by this Agreement.  In connection with the foregoing, each Party will (a) promptly notify the other Party of any written communication to that Party or its Affiliates from any Governmental Entity and, subject to Law, provide the other Party with a copy of any written communication to any of the foregoing and (b) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning the transactions contemplated by this Agreement unless it consults with the other Party in advance and, to the extent permitted by such Governmental Entity, give the other Party the opportunity to attend and participate thereat, with respect to this Agreement or the Ancillary Documents and the transactions contemplated hereby or thereby.  Nothing contained herein will require any Party to pay any consideration (except filing and application fees) to any other Person from whom any such consents, approvals or authorizations are requested.

**VI.3     <u>Effectiveness of Representations and Warranties</u>.**

Subject to the restrictions set forth in the Bankruptcy Code or any orders of the Bankruptcy Court, from the date hereof through the Closing Date, each Seller shall use all reasonable efforts to conduct the Business in such a manner so that the representations and warranties contained in <u>Article IV</u> shall continue to be true and correct on and as of the Closing Date as if made on and as of the Closing Date.

**VI.4     <u>Conduct of the Business</u>.**

(a)     Subject to any order of the Bankruptcy Court and the requirements of the Bankruptcy Code, the Seller shall ensure that, after the date hereof and prior to the Closing Date, except (x) as expressly provided by or contemplated under this Agreement, (y) as set forth on or (z) with the prior written consent of the Buyer:

(i)     The Seller shall not enter into any Alternative Transaction;

24

(ii)     the Seller shall use commercially reasonable efforts under the circumstances to conduct the Business in the ordinary course consistent in all material respects with past practice since the Petition Date;

(iii)    the Seller shall not assume or guarantee the obligations of any other Person;

(iv)    the Seller shall not make any loans, advances or capital contributions to, or investments in, any other Person, other than reimbursement of business expenses to employees in the ordinary course of business consistent with past practice;

(v)     the Seller shall not sell, transfer, lease, sublease, license, relinquish, surrender, encumber or otherwise dispose of any material Purchased Asset, except for the sale, transfer, lease, sublease, license or other disposition of equipment and Inventory in the ordinary course of business;

(vi)    the Seller shall not agree to make any capital expenditures or acquire any business or other assets (other than Inventory in the ordinary course of business consistent with past practice);

(vii)   the Seller will use commercially reasonable efforts under the circumstances to cause the Real Tangible Personal Property included in the Purchased Assets to be maintained in substantially the same condition (normal wear and tear and obsolescence excepted) that it has heretofore maintained the same; and

(viii)  the Seller shall, conduct the Business in compliance with all Laws in all material respects, and the Seller shall, use commercially reasonable efforts under the circumstances to maintain, preserve, renew and keep in full force and effect all material Permits included in the Purchased Assets in all material respects;

(b)     Prior to the Closing, each Seller shall use its commercially reasonable efforts under the circumstances to preserve intact its business organizations and relationships with third parties relating to the Business and to keep available the services of its respective current officers and key employees, subject to the terms of this Agreement, and in each case, subject to any obligations as a debtor or debtor-in-possession under the Bankruptcy Code or order of the Bankruptcy Court or other court of competent jurisdiction.

**VI.5    Transfer Taxes.**

In the event that any transfer, sales, use, stamp duty, value-added, documentary, registration, recording or other similar Taxes (collectively, "***Transfer Taxes***") are assessed or are required to be paid with respect to such sale, conveyance, assignments, transfers or deliveries, such Transfer Taxes shall be borne and paid by the Buyer.  The Seller and the Buyer will execute,

25

deliver and cooperate in timely filing all Tax Returns required to be filed in connection with the payment of such Taxes.

### VI.6    Tax Sharing Agreements.

On or prior to Closing, the Seller will terminate all Tax or Income Tax allocation or sharing agreements, if any, to the extent they are related to the Purchased Assets, *provided*, *however*, that for the avoidance of doubt this Section 6.6 shall not apply to any customary provisions relating to the payment of Taxes in any leases to which the Leased Real Property is subject.

### VI.7    Access to the Business, Records and Documents.

(a)    Except as may be prohibited by Law, by the terms of any contract or under any confidentiality or non-disclosure agreement, prior to the Closing (provided, that the Seller have advised the Buyer of the nature of any such restriction and made such disclosure as is permitted), the Seller will (i) upon reasonable notice, permit representatives of the Buyer to have reasonable access during normal business hours and under reasonable circumstances to all personnel, premises, properties, assets, Books, Records, contracts and documents of the Business and (ii) furnish the Buyer with financial and all other information in the Seller's possession relating to  the Purchased Assets  as the Buyer may from time to time reasonably request; *provided*, *however* that the Buyer may not under any circumstances conduct or cause to be conducted any intrusive or invasive environmental testing at any of the properties of the Seller, including any of the Leased Real Property.

The Buyer will preserve and maintain all Books and Records included in the Purchased Assets (including all items under Section 2.2(a)(iv)) and Assumed Liabilities for a period of two (2) years following the Closing Date.  After such two-year period, the Buyer will provide at least sixty (60) days prior written notice to the Seller of its intent to dispose of any such Books and Records, and the Seller and their respective Affiliates will be given the opportunity, at their cost and expense, to remove and retain all or any part of such books and records as they may select.  During such two-year period, duly authorized representatives of the Seller and their respective Affiliates will, upon reasonable notice, have reasonable access during normal business hours to examine, inspect and copy such Books and Records; provided that, to the extent that disclosing any such information would reasonably be expected to constitute a waiver of attorney-client, work product or other privilege with respect thereto, the Parties will take all commercially reasonable action to prevent a waiver of any such privilege, including entering into an appropriate joint defense agreement in connection with affording access to such information.

### VI.8    Publicity.

Following the date hereof, until the Closing or the date the Agreement is terminated or abandoned pursuant to Article IX, the Buyer may not issue or cause the publication of any press

release or other general media communication with respect to this Agreement or the transactions contemplated hereby, including communications with the Seller's employees (including organized labor representatives, if any), creditors, customers and suppliers, without the express written consent of the Seller.

**VI.9**   **Contacts with Suppliers, Customers and Other Parties.**

Prior to the Closing, the Buyer and its representatives may, with the consent of the Seller, not to be unreasonably withheld or delayed, contact, and discuss this Agreement and the transactions contemplated hereby with, any supplier to, or customer of, the Business, counterparties to any Contracts or any Governmental Entity and, with the participation of the Seller, or any employees of the Seller.

**VI.10**   **Ancillary Documents.**

On or prior to the Closing Date, each of the Buyer and the Seller shall, execute and deliver to the other party thereto the Ancillary Documents to which it is a party.

**VI.11**   **Confidentiality.**

(a)   The Buyer acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 6.7, and the consummation of the transactions contemplated hereby, is subject to the confidentiality terms under the Master Device Purchase and Services Agreement dated October 7, 2024 by and among the Seller and the Buyer (the "***Confidentiality Agreement***"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; *provided*, *however*, that the Buyer acknowledges that any and all other Confidential Information provided to it by any Seller or its representatives concerning any Seller or their respective subsidiaries shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(b)   The Seller has had access to and contributed to information and materials of a highly sensitive nature (including Confidential Information) regarding the Purchased Assets and the Business. Each Seller agrees that unless it first secures the written consent of an authorized representative of the Buyer, it shall not use for itself or anyone else, and shall not disclose to others, any Confidential Information except to the extent such use or disclosure is required by Law (in which event it shall inform the Buyer in advance of any such required disclosure, shall cooperate with the Buyer in all reasonable ways in obtaining a protective order or other protection in respect of such required disclosure, and shall limit such disclosure to the extent reasonably possible while still complying with such requirements). Each Seller shall use reasonable care to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.

27

**VI.12  Delivery of Seller Disclosure Schedules.**

Notwithstanding anything to the contrary, the Seller shall, deliver the Seller Disclosure Schedules, if any, to the Buyer prior to the Closing Date, and upon such delivery, the Seller Disclosure Schedules shall be incorporated into this Agreement in accordance with <u>Section 10.12</u> hereof.

**Article VII**
**<u>CLOSING CONDITIONS</u>**

**VII.1  <u>Conditions to Obligations of the Buyer</u>.**

The obligations of the Buyer to effect the Closing are subject to the fulfillment or waiver on or before the Closing Date of the following conditions:

(a)    The representations and warranties of the Seller contained in this Agreement or the Ancillary Documents that are qualified as to materiality or Material Adverse Effect, shall be true and correct and the representations and warranties of Seller contained in this Agreement or the Ancillary Documents that are not so qualified shall be true and correct in all material respects, as of the Closing Date, except for changes therein specifically permitted by this Agreement or the Ancillary Documents and except that representations and warranties made with respect to a specified date need only be true and correct in all material respects as of such date.

(b) The covenants and agreements contained herein or in any Ancillary Documents to be performed or complied with by the Seller on or prior to the Closing Date shall have been performed or complied with in all material respects.

(c)    The Seller will have delivered to the Buyer evidence of title to (i) all United States and foreign patents and (ii) all Permits (if any) comprised in the Purchased Assets, in each case in a form and substance acceptable to the Buyer. In the case of (i), copies of the relevant patent registrations in the name of the Seller will be acceptable evidence to the Buyer.

(d)    The Seller will have provided to the Buyer all information necessary to transfer to the Buyer (i) all Amazon Web Services resources (including billing resources), and (ii) ownership of and administrative access to all Seller accounts of Amazon Web Services, Microsoft, Apple and Google Play.

(e)    Amazon Web Services, Inc., the Buyer and the Trustee shall have agreed in writing that the only payments required to transfer to the Buyer (i) all Amazon Web Services resources (including billing resources) and (ii) ownership of and administrative access to all Seller accounts of Amazon Web Services are the Buyer AWS Payments and the Trustee AWS Payments.

28

(f)     All of the Seller Required Consents shall have been obtained or given, as applicable, and be in full force and effect.

(g)     There shall be no litigation pending or, to the Seller's Knowledge, threatened, in which any injunction is sought to prevent the transactions contemplated hereby, or the transfer of the Purchased Assets to the Buyer, free and clear of all Liens, Claims or encumbrances except Permitted Liens.

(h)     The Seller, as applicable, will have delivered to the Buyer:

(i)     a certificate, dated the Closing Date, duly executed by an officer of the Seller to the effect of <u>Section 8.1(a)</u> and <u>Section 8.1(b)</u> above;

(ii)     a duly executed counterpart of the Bill of Sale, Assignment and Assumption Agreement in a form mutually agreed upon by the Parties (the "***Bill of Sale, Assignment and Assumption Agreement***");

(iii)     a duly executed and lawful assignment to the Buyer of the Patent License Agreement dated December 13, 2022 and between Comcast Cable Communications, LLC and the Seller, and the written consent of Comcast Cable Communications, LLC to such assignment; and

(iv)     such other instruments of sale, transfer, conveyance and assignment (and obtaining any requisite third-party consents for the same) as the Buyer may reasonably request to effect the transactions contemplated thereby.

(i)     The Bankruptcy Court shall have entered the Approval Order in a form and substance satisfactory to the Buyer.

### VII.2   Conditions to Obligations of the Seller.

The obligations of the Seller to affect the Closing are subject to the fulfillment or waiver on or before the Closing Date of the following conditions:

(j)     The representations and warranties of the Buyer contained in this Agreement or the Ancillary Documents shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of such dates, except for changes therein specifically permitted by this Agreement or the Ancillary Documents.

(k)     The covenants and agreements contained herein or in any Ancillary Document to be performed or complied with by the Buyer on or prior to the Closing Date shall

29

have been performed or complied with in all material respects which shall have been performed in all respects.

(l)     There shall be no litigation pending or, to the Buyer's knowledge, threatened, in which any injunction is sought to prevent the transactions contemplated hereby, or the transfer of the Purchased Assets to the Buyer, free and clear of all Liens, Claims or Encumbrances except Permitted Liens.

(m)     The Buyer shall have delivered:

(i)     to the Seller, the Closing Cash Payment;

(ii)     to Amazon Web Services, Inc., payment of:

(a)     on account of the Buyer:

(i)     an amount equal to 50% of the total outstanding amounts owing by the Seller to Amazon Web Services, Inc. in relation to the period prior to the Petition Date, to the extent necessary to permit the transfer of Seller's accounts with AWS to the Buyer; and

(ii)     all amounts owing by the Seller to Amazon Web Services, Inc. in relation to the period following November 15, 2024 until the Closing,

(together, the ***Buyer AWS Payments***); and

(b)     on behalf of the Trustee pursuant to the Approval Order, and as a deduction to the Purchase Price pursuant to <u>Section 3.3(a)(ii)</u>:

(i)     an amount equal to 50% of the total outstanding amounts owing by the Seller to Amazon Web Services, Inc. in relation to the period prior to the Petition Date, to the extent necessary to permit the transfer of Seller's accounts with AWS to the Buyer; and

(ii)     all amounts owing by the Seller to Amazon Web Services Inc. in relation to the period from the Petition Date until November 15, 2024 (inclusive of both dates), being $$140,639,

(together, the ***"Trustee AWS Payments"***);

30

(iii)    to the Seller the Bill of Sale, Assignment and Assumption Agreement, duly executed by the Buyer;

(iv)    to the Seller such other instruments of sale, transfer, conveyance and assignment as the Seller may reasonably request to effect the transactions contemplated thereby.

(n)    The Bankruptcy Court shall have entered the Approval Order.

(o)    The Buyer shall have delivered to the Seller a certificate, dated the Closing Date, duly executed by an officer of the Buyer to the effect of Section 8.2(a) and Section 8.2(b).

(p)    The Escrow Agent shall have delivered the Deposit to the Seller.

**VII.3**    Frustration of Closing Conditions. Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 10.1, Section 10.2, or Section 10.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## Article VIII
## TERMINATION

**VIII.1**  **Termination of Agreement.**

This Agreement may be terminated at any time prior to Closing and the transactions contemplated hereby may be abandoned:

(d)    by the mutual written consent of the Seller and the Buyer;

(e)    by the Seller or the Buyer if any court of competent jurisdiction or governmental body, authority or agency having jurisdiction, including the Bankruptcy Court, shall have issued an order, decree or ruling or taken any other action that is enforceable notwithstanding the automatic stay imposed by Section 362(a) of the Bankruptcy Code (which order, decree, ruling or other action the Parties hereto shall use commercially reasonable efforts to lift) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become a Final Order;

(f)    by the Seller, if there has been a material breach of any of the representations, warranties, agreements or covenants set forth in this Agreement on the part of the Buyer which, if not cured, would reasonably be expected to render the satisfaction of any of the conditions set forth in Section 8.2 impossible and such breach has not been cured within five (5) days following the Seller's written notice of such breach; *provided* that the right to terminate this Agreement under this Section 9.1(c) shall not be available to the Seller if the Seller is in material breach of this Agreement;

31

(g)    by the Buyer, if there has been a material breach of any of the representations, warranties, agreements or covenants set forth in this Agreement on the part of the Seller which, if not cured, would reasonably be expected to render the satisfaction of any of the conditions set forth in <u>Section 8.1</u> impossible and such breach has not been cured within five (5) days following the Buyer's written notice of such breach; *provided* that that the right to terminate this Agreement under this <u>Section 9.1(d)</u> shall not be available to the Buyer if the Buyer is in material breach of this Agreement; and

(h)    by Seller, upon written notice given to the Buyer, if the Closing shall not have occurred on or before December 31, 2024; *provided, however*, that the right to terminate this Agreement under this <u>Section 9.1(e)</u> shall not be available to the Seller if the Seller has failed to perform in all material respects its obligations under this Agreement and such failure has been the cause of, or results in, the failure of the Closing to occur on or prior to December 31, 2024.

## VIII.2    <u>Effect of Termination.</u>

If any Party terminates this Agreement pursuant to <u>Section 9.1</u> above, all of the unperformed obligations of the Parties hereunder shall terminate without any liability of any Party to such other Party; *provided*, that nothing herein shall relieve any Party from any liability for any breach of this Agreement.

## Article IX
## MISCELLANEOUS

### IX.1    <u>Survival of Representations and Warranties.</u>

All of the representations and warranties set forth in this Agreement or in any Ancillary Documents delivered by any Seller in connection with the Closing shall survive the execution and delivery of this Agreement and until Closing, but shall not survive Closing and shall terminate upon Closing.

### IX.2    <u>Notices.</u>

Any notice, request, instruction or other document to be given hereunder will be sent in writing and delivered personally, sent by reputable, overnight courier service (charges prepaid), sent by registered or certified mail, postage prepaid, or by electronic mail, according to the instructions set forth below.  Such notices will be deemed given: at the time delivered by hand, if personally delivered; one business day after being sent, if sent by reputable, overnight courier service; at the time received, if sent by registered or certified mail; and at the time when electronic mail is received, if sent by electronic mail.

If to the Seller:                                          Albert Altro
                                                          albertaltro@traversellc.com

With a copy (which will not constitute notice) to:        Sullivan Hazeltine Allinson LLC
                                                          919 North Market St., Suite 420
                                                          Wilmington, DE 19801
                                                          Attention:  William Hazeltine
                                                          Email: whazeltine@sha-llc.com

If to the Buyer:                                          Richard Joffe
                                                          richard@honeyinsurance.com
                                                          Simon Farrugia
                                                          simon@honeyinsurance.com
                                                          Martin Brooke
                                                          martin@honeyinsurance.com

or to such other address or to the attention of such other party that the recipient party has specified by prior written notice to the sending party in accordance with the preceding.

### IX.3   Expenses; No Offset.

Except as expressly provided in this Agreement, each of the Buyer and the Seller will bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby, whether or not such transactions are consummated.  Neither Party may make any offset against amounts due to the other Party pursuant to this Agreement, the Ancillary Documents or otherwise. Notwithstanding the foregoing, in the event of any suit or action based on breach of this Agreement, the prevailing party shall be entitled to recover its reasonable costs, including, but not limited to, attorney fees in addition to such other remedies as may be allowed by Law.

### IX.4   Bulk Sales or Transfer Laws.

The Buyer waives compliance by the Seller with the provisions of any bulk sales Laws that may be applicable to the transactions contemplated by this Agreement.

### IX.5   Assignment; Successors and Assigns.

Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by either Party (whether by operation of Law or otherwise) without the prior written consent of the other Party; *provided*, *however*, that, without the consent of the Seller, the Buyer may assign and delegate its rights under this Agreement to one or more Affiliates of the Buyer; *provided further* that, no such assignment or delegation shall relieve the Buyer of its obligations under this Agreement. Subject to the preceding sentence, and except as otherwise expressly provided herein, this Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**IX.6    Amendment; Waiver.**

This Agreement may be amended by a written instrument executed and delivered by the Seller and the Buyer. At any time prior to the Closing, the Parties may extend the time for performance of or waive compliance with any of the covenants or agreements of the other Party to this Agreement and may waive any breach of the representations or warranties of such other Party. No agreement extending or waiving any provision of this Agreement will be valid or binding unless it is in writing and is executed and delivered by or on behalf of the Party against which it is sought to be enforced.

**IX.7    Severability; Specific Performance.**

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under Law, but if any provision of this Agreement is held to be prohibited by or invalid under Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement. Each Party acknowledges and agrees that the other Party may be irreparably damaged if any provision of this Agreement is not performed in accordance with its terms or otherwise is breached. Accordingly, each Party agrees that the other Party may be entitled, subject to a determination by a court of competent jurisdiction, to injunctive relief to prevent any such failure of performance or breach and to enforce specifically this Agreement and any of the terms and provisions hereof.

**IX.8    Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all such counterparts taken together will constitute one and the same Agreement. All signatures of the Parties to this Agreement may be transmitted by electronic mail, and such electronic mail will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

**IX.9    Descriptive Headings.**

The descriptive headings of this Agreement are inserted for convenience only and will not constitute a part of this Agreement.

### IX.10  <u>No Third-Party Beneficiaries</u>.

This Agreement will not confer any rights or remedies upon any Person or entity other than the Parties hereto, their respective successors and permitted assigns.

### IX.11  <u>Entire Agreement</u>.

This Agreement and the Ancillary Documents collectively constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

### IX.12  <u>Exhibits and Schedules</u>.

### IX.13   <u>Reserved.  Non-Recourse</u>.

No past, present or future director, officer, employee, incorporator, member, partner, equity holder (other than the Seller), lender, agent or representative of any Seller shall have any liability for any obligations or Liabilities of the Seller under this Agreement or the Ancillary Documents of or for any Claim, counterclaim, cause of action or demand based on, in respect of, or by reason of, the transactions contemplated hereby and thereby except for any Claim against an individual based on the fraud of such individual in connection with the representations set forth in <u>Article IV</u> and <u>Article V</u> hereof.

### IX.14  <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the Laws of the Delaware (regardless of the Laws that might otherwise govern under applicable Delaware principles of conflicts of Law) as to all matters, including matters of validity, construction, effect, performance and remedies.

### IX.15  <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(d)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 10.2</u> hereof; *provided*, *however*, that if the Bankruptcy Case has closed, the Parties agree, subject to their respective rights to seek to reopen the Bankruptcy Cases, to unconditionally and irrevocably submit to the exclusive jurisdiction of any state or federal court located in the State of Delaware and any appellate court from any thereof, for the resolution of any such Claim or dispute.   The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection

35

which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(e)     Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 10.2</u>.

### IX.16  <u>WAIVER OF JURY TRIAL</u>.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

### IX.17  <u>United States Dollars</u>.

All references to "$" in this agreement are to U.S. Dollars.  For purposes of computing the value of any item that originally may have been denominated in any foreign currency and subsequently converted to U.S. Dollars, the amount shall be computed by converting the amount expressed in such foreign currency to U.S. Dollars at the official rate for conversion of U.S. Dollars to such foreign currency as published in the *Wall Street Journal* for the day preceding the date on which such item is incurred, paid, or calculated, as the case may be.

[Remainder of page intentionally left blank]

36

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Asset Purchase Agreement on the date first written above.

**SELLER** :

**GET NOTION, LLC**

By: _____

       Name:   Scott Ford

       Title:    Chief Operating Officer

**BUYER:**

**HONEY INSURANCE PTY LTD**

By: _____

       Name:   Richard Joffe

       Title:    Chief Executive Officer